FELICIANO SORIANO AND TANYA SORIANO, PETITIONERS v.
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 20902-85.     Filed January 11, 1988.

*John R. Tjaden,* for the petitioners.
*Ronald D. Pinsky* and *Richard J. Wood,* for the respondent.

GERBER, *Judge:* Respondent, in a notice of deficiency dated April 9, 1985, determined deficiencies in petitioners' Federal income taxes and additions to tax as follows:

| Year | Deficiency | Sec. 6659 addition [1] |
|---|---|---|
| 1978 | $4,165 | $1,249 |
| 1979 | 3,882 | 1,165 |
| 1980 | 6,177 | 1,853 |
| 1981 | 8,548 | 2,564 |
| 1982 | 12,236 | 3,671 |

The issues in this case result from petitioners' involvement in the leasing of electronic energy management devices from O.E.C. Leasing Corp.[2] After concessions, the issues for our consideration are whether petitioners are: (1) Entitled to deduct rental and installation expenses incurred by the

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

[2] This case is one of a large group of cases which are related because of the common issue involving leasing of electronic energy management devices from O.E.C. Leasing Corp. The parties in a number of these cases have agreed to be bound by the outcome in this case.

Carolina Audio-Video Leasing Co. partnership in connection with the energy management devices; (2) entitled to investment tax credits and business energy credits arising out of this venture; (3) liable for the section 6659 overvaluation addition to tax; and (4) liable for additional interest imposed by section 6621(c) on tax-motivated transactions.

FINDINGS OF FACT

Petitioners resided in Germantown, Maryland, at the time the petition was filed in this case. The transactions in question occurred when petitioners resided at Fort Bragg, North Carolina. The stipulated facts and exhibits are incorporated herein by this reference.

On or about August 1, 1982, petitioner,[3] Feliciano Soriano, retired from the U.S. Army following a career of approximately 29 years in the military. Prior to Feliciano's retirement, petitioners had between $10,000 and $20,000 in savings and were looking for a suitable investment. Earlier investments in single family houses did not succeed, and cash outlays on the houses exceeded the income generated.

Petitioners learned about Carolina Audio-Video Leasing Co. (Carolina), a North Carolina partnership, in May of 1982. They attended an investment seminar with Warren Barker (Barker), an army officer supervised by petitioner at Fort Bragg, and Inge Fischer (Fischer), petitioners' accountant, tax advisor, and tax return preparer. A document entitled "BRIEF DESCRIPTION OF THE PROPOSED AUDIO VIDEO INVESTMENT" was handed out at the seminar. This document was primarily concerned with tax benefits, including investment tax credits and depreciation deductions. Petitioners relied on the advice of Barker, who had been working toward a master's degree in business administration, and Fischer, who had 10-years experience in tax matters in investing in Carolina. Petitioners ultimately invested $12,000 in Carolina, an 8-percent general partnership interest.

Carolina was originally formed to lease and distribute audio, video, and amusement- or entertainment-oriented equipment. No other business could be carried on without

---

[3]Hereinafter petitioner, when used in the singular, refers only to petitioner Feliciano Soriano.

the consent of all the partners. The partners executed a power of attorney in favor of Security Financial Corp. (Security), which managed the business of the partnership. Petitioners were not involved in the daily operation or affairs of the partnership.

Petitioners subsequently learned in the early part of 1983 that the partnership had leased energy management devices. They had not specifically authorized this investment. Petitioners claimed the deductions and credits reported on the partnership Schedule K-1 on their 1982 Federal income tax return.[4] Petitioner went to Security's offices after the 1982 return was filed and briefly viewed several favorable appraisals of the leasing project. This was the extent of petitioners' actions with regard to the energy management devices.

O.E.C. Leasing Corp. (OEC) was the promoter of the energy management leasing venture. When the transactions at issue took place, OEC was a closely held corporation. Apparently, OEC purchased the devices from Franklin New Energy Corp., the manufacturer. There were three different models of the device, each with different capabilities. The purchase price was $65,000 for the energy minder system (EMS I), $175,000 for the EMS II, and $280,000 for the EMS III. OEC paid for the devices with a 10-percent cash downpayment, the remainder financed by 25-year fully recourse promissory notes bearing 10-percent interest. OEC was to prepay the notes with 75-percent of the proceeds it received from leasing the devices. The purchase price was approximately 65 times the seller's original cost. The price and manner of financing were highly unusual in the industry.[5]

Apparently, prior to purchasing the devices, OEC had found prospective lessees. Carolina was one such prospect, leasing four EMS III's from OEC. In connection with the leases, Carolina received appraisals, which were part of the promotional materials, stating that the purchase prices were

---

[4]This consisted of a $9,134 net operating loss, $8,960 in investment tax credits, and $8,960 in business energy credits. All of the credits and most of the net operating loss are attributable to the OEC transaction. Further, the loss was attributable to petitioners' distributive share of $100,000 advanced rental expense, $12,000 installation expense, and $4,675 other expense related to the OEC transaction. These credits and deductions were claimed with respect to petitioners' $12,000 cash (or "out-of-pocket") investment.

[5]Most of this information was contained in the tax opinion for OEC.

reasonable and that the useful life of the devices was 25 years. One appraisal, prepared by an architect, George Lemonides, estimated that the device would save 20 to 40 percent in fuel costs, and also estimated a 20-percent increase in fuel prices through the year 2000. The architect's appraisal deemed reasonable OEC estimates of 20-percent savings and 15-percent energy price increases. The other appraisal, prepared by Nicholas Arteca, an engineer, while affirming the devices' fair market values, warned that many variables would affect the lessee's profitability, including the building where installed, energy inflation, and technological obsolescence. After the leases were executed, Carolina received a document dated February 14, 1983, entitled "Technical and Financial Evaluation." Using alternative 10- and 15-percent fuel inflation figures, the evaluation reflected cash-flow to lessees of approximately $14,000 and $29,000, respectively, for an EMS I. This took into account tax benefits (credits and deductions), ignored a 15-percent service expense, and used a 20-percent energy savings assumption. The figures used were apparently provided by OEC. The evaluation concluded that the project would be viable if energy cost increases remained at 15 percent, but warned that new Department of Energy projections should be consulted to verify such cost increases.

On December 28, 1982, Barker, on behalf of Security (agent for Carolina), executed 20-year leases for four EMS III units. Under the leases, OEC was to receive $25,000 "advanced rental" for the first year per unit. After that, OEC would receive 75 percent of the *net* proceeds from Carolina's exploitation of the unit. OEC could cancel the lease after 10 years, or after 6½ years if no proceeds were returned for 5 years.

The final component in this multiple level transaction was the end-user. According to plan, the lessee would retain a service company to install and maintain the units at an end-user's industrial or commercial facility. Under such a "service contract" the end-user agreed to pay the service company 50 percent of the energy conservation savings generated by use of the unit. The service company would pay these proceeds over to the lessee, retaining 15 percent

as a fee. The lessee also paid the service company an installation fee. Thus, OEC would purchase the devices and immediately lease them to a lessee (Carolina). The lessee would then retain a service company to install and maintain the units in the facility of an end-user and split the savings generated thereby.

From the foregoing agreements, the percentage distribution of any hypothetical savings to an end-user is computed:[6]

End-user: 50 percent
Service company: 7.5 percent (50 percent times 15 percent)
Lessor (OEC): 31.88 percent (75 percent times (50 percent less 7.5 percent))
Lessee (Carolina): 10.62 percent (100 percent less 50 percent less 7.5 percent less 31.88 percent)

Security, as agent for Carolina, agreed to pay Control Technology $12,000 to install the four units and to be its service company. Petitioner has presented evidence of only one actual installation, in October 1983. Allman Electric Co. agreed to service a unit to be installed at Pat Carter, Inc., in Fayetteville, North Carolina.

The units themselves are electronic devices designed to regulate oil, gas, steam, and electrical usage, thereby conserving energy to the end-user. There are a number of such devices on the market. The cost of such a system is based upon its capabilities and the number of functions it can perform. Respondent's expert's report explains these factors in a clear and concise manner and we quote from it below:

EXPLANATION OF ENERGY MANAGEMENT SYSTEM TERMS

a. *Number of points.* A point is a physical device in the building which operates an actuator or starter *or* measures a temperature, status or similar parameter. The number of points a system can control or monitor is the most fundamental characteristic of a system for it establishes the system size. More points translates to more control, larger buildings and larger savings. Typical points for a system are:

on-off control of a fan motor starter
on-off control of a pump motor starter
on-off control of a lighting contactor

---

[6]We adopt respondent's expert's analysis on this aspect, as confirmed by the evidence presented.

status input of a fire alarm
status input of a fan failure
temperature measurement of the outdoor air
temperature measurement of the space.

b. *Functions performed.* The functional capability of a system defines the extent to which the system can conserve energy and perform other tasks. Typical capabilities of systems include:

Duty cycling: periodically switch equipment off for short periods of time

Time-of-day: switch equipment on/off on a scheduled basis using the calendar, day of week or time of day

Demand limiting: switch equipment off for short periods in order to avoid excessive (peak) electrical usage

Temperature compensation: duty cycling and demand limiting can be enhanced by compensating for room temperatures

Record keeping: maintaining data on utility or temperature measurements

Optimum start-stop: using measured outdoor and indoor temperatures to determine the optimum equipment start-up or shutdown

Remote access: interface to the EMS by telephone using a terminal and modem

Enthalpy optimization: controlling outdoor dampers on air handling units to minimize cooling

Load prediction: anticipate cycling of loads and its effect on electrical demand

Low level user programing [sic]: allow for the user to define a few unique sentences using an internal language

Simple building security: monitor alarms on a secondary basis and notify appropriate terminals

Custom applications: special sequences established to control large equipment such as chillers and boilers

Maintenance management: provide equipment database, work orders, manning reports and other related reports

Full HVAC control (Direct Digital Control (DDC)): closed loop control using a sensor and analog output to maintain temperatures

Full Fire and Security: approved primary monitoring of fire and security sensors

Higher level programming: Fortran, Basic or other higher level language programming.

c. *User Interface.* The user interface impacts the ease with which the user can program the above functions and monitor the results. The types of interface are:

LED with Keypad: The most basic user interface is a keypad with the digits 0-9 and a few other function keys and a two to six digit LED display. Often with such an interface LED point lights are used to indicate on-off status or indicate the next programming operation to take place.

ASCII terminal: An ASCII terminal is a standard computer terminal with a QWERTY keyboard and CRT display or hardcopy display. This type of interface typically allows for prompting for program inputs and simple reports.

Multi-terminals: This type of system allows more than one person to be using the system at a time. For example, one person may be checking the status of equipment and the other may be changing schedules.

Colorgraphics terminals: A colorgraphics terminal displays equipment schematically with realtime temperatures and status in appropriate locations.

The salient features of the EMS series are tabulated below:

|  | EMS I | EMS II | EMS III |
|---|---|---|---|
| Points: | 4 | 14 | 24 |
| Functions: | Duty cycling | Duty cycling | Duty cycling |
|  | Time-of-day | Time-of-day | Time-of-day |
|  |  | Demand limiting | Demand limiting |
|  |  | Remote interface | Optimum start-stop |
|  |  |  | Temp. compensation |
|  |  |  | Remote access |
|  |  |  | Record keeping |
| Interface: | LED w/keypad | LED w/keypad | LED w/keypad |
|  |  |  | ASCII |
| Designated cost: | $65,000 | $175,000 | $280,000 |
| Cost per point: | $16,250 | $12,500 | $20,000 |

The average cost per point for a random sampling of small units (4 to 125 points) is $305; medium units (50 to 750 points) averaged $230; large custom units (500 to 2000-plus points) vary from $500 to $1,200 per point.[7] In the general marketplace, the most expensive units were $8,213 (small) and $20,000 (medium). Large units must be custom built and may cost $50,000 or more. Units comparable to the EMS I, II, and III may be purchased for about $1,500, $1,600, and $4,800, respectively.

The ultimate profitability of the venture to OEC and its lessees was dependent upon a number of factors, including the annual energy bill, actual cost savings to the end-user, the rate of inflation for energy costs, and useful physical and economic life of the equipment. The minimum size annual energy bills which would justify use of the EMS I, II, and III are $20,000, $60,000, and $90,000, respectively. Based on a 1982 Department of Energy (DOE) report,

---

[7]We use figures provided in respondent's expert's report. Costs are list price using 20 units (small) and 5 units (medium).

energy costs were forecast to increase, on the average, 3.8 percent (electricity—2.0 percent, gas—9.1 percent, oil—4.3 percent). This is a weighted average for the typical industrial/commercial fuel combination. Considering a 7-percent inflation rate, the annual rate of energy cost increase would be 10.8 percent. DOE reports for earlier periods had projected cost increases of some 20 percent.

Actual energy savings to a particular end-user may vary significantly, depending on physical characteristics of the facility and energy conservation measures which may already have been taken. Industry reports predicted 5- to 12-percent savings with a maximum of approximately 20 percent. Actual savings are often less than projected.

We must also evaluate the useful physical and economic life of the devices. Optimistic estimates of the engineering useful life of these units is 20 to 25 years. Engineering or physical useful life is the length of time the unit may remain operational with normal repairs. The units in question were warranted for only 1 year. Electronic equipment is also subject to obsolescence (economic useful life); while the unit is still operative, it may nonetheless be more cost effective to replace it with newer, more efficient technology. These units are also subject to obsolescence or failure of the underlying climate control units (central heating or air-conditioning units). When these are replaced, the new units often incorporate internal energy-management control systems. Thus, these devices have a useful life somewhere between 10 and 20 years.

OPINION

We pursue here the now familiar process of testing the economic substance of a transaction involving an otherwise normal business product or concept.[8] Respondent, in his notice of deficiency, disallowed all the deductions and credits related to petitioners' OEC investment. Petitioners bear the burden of proof on all pertinent items—profit objective, useful life, fair market value, placement in service, and others. See *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142(a).

---

[8]The product here involved could be useful as a means of energy and cost conservation, and the marketing approach, on its face, seems unique and effective.

All claimed deductions and credits are a matter of legislative grace, and must have a basis in the statute. *New Colonial Ice Co. v. Helvering,* 292 U.S. 435 (1934). Section 162 allows a deduction for ordinary and necessary expenses incurred in carrying on a trade or business. Similarly, section 212 allows a deduction for expenses incurred in transactions entered into for profit. The claimed advanced rental, installation, and other expenses must come within these statutory provisions to be deductible.

Section 38 allows a credit for investment in certain depreciable property. The credit is allowable on "section 38 property"—generally tangible personal property which is subject to the allowance for depreciation. Sec. 48(a)(1). Depreciation is allowable on property subject to wear and tear or obsolescence and used in a trade or business or for the production of income. Sec. 167(a). The amount of this credit is limited to the percentage of a taxpayer's qualified investment in section 38 property. Sec. 46(a)(2)(A)(i).[9] Qualified investment is a percentage of basis, and basis is generally cost. Secs. 46(c) and 1011. Under section 48(d), the lessor of property, here OEC, may elect to pass through the credit to the lessee, here Carolina—the lessee is treated as having acquired the property for its fair market value. The claimed investment tax credits on the EMS units must fit within these provisions.

Section 46(a)(2)(A)(ii)[10] allows an additional percentage credit for energy property.[11] Energy property is specifically defined as, among other things, an automatic energy control system designed to reduce the amount of energy consumed in an industrial or commercial process. Sec. 48(l)(2)(A)(iii), (l)(5). Section 48(d), the credit pass-through provision, also specifically applies to the energy credit. The claimed energy credits on the EMS units must fit within these provisions.

A common threshold for the claimed tax benefits is that the taxpayer must be engaged in a trade or business, or in a transaction entered into for profit. Otherwise, no credits

---

[9]This section was redesignated as sec. 46(a)(1) by sec. 474(o)(1), Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, 834.

[10]The Tax Reform Act of 1984 redesignated this section as 46(a)(2). See note 9 *supra.*

[11]For the years at issue, both the regular and energy percentages are 10 percent. Sec. 46(a)(2)(B)-(C). For the units at issue, the energy credit expired Dec. 31, 1982. Sec. 46(a)(2)(C)(i)(I).

are allowed, and deductions may be allowed only to the extent there is income from the activity. Sec. 183. This Court and others have commented on the "profit objective" requirement in many "tax shelter" cases. A representative sample of these cases was summarized in our opinion in *Beck v. Commissioner*, 85 T.C. 557, 569-570 (1985):

Essential to such a showing is a demonstration that petitioner had "an actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Fuchs v. Commissioner*, 83 T.C. 79, 98 (1984); *Dean v. Commissioner*, 83 T.C. 56, 74 (1984). While a reasonable expectation of profit is not required, petitioner's objective of making a profit must be bona fide. *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. * * * . "Profit" in this context means economic profit, independent of tax savings. *Herrick v. Commissioner*, [85 T.C. 237, 254 (1985)]; *Surloff v. Commissioner*, 81 T.C. 210, 233 (1983).

Whether petitioner possessed the requisite profit objective is a question of fact to be resolved on the basis of all the facts and circumstances. *Elliott v. Commissioner*, 84 T.C. 227, 236 (1985) [affd. 782 F.2d 1027 (3d Cir. 1986)], and cases cited therein. Although no one factor is determinative, greater weight must be given to objective facts than to petitioner's mere statement of his intent. *Siegel v. Commissioner*, 78 T.C. 659, 699 (1982); *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979); sec. 1.183-2, Income Tax Regs. * * * [Fn. ref. omitted.]

We have used objective factors in determining profit motive. See cases summarized in *Rose v. Commissioner*, 88 T.C. 386, 412-414 (1987).

Profit motive is determined at the partnership level, not at the individual partner level. *Goodwin v. Commissioner*, 75 T.C. 424, 437 (1980), affd. without published opinion 691 F.2d 490 (3d Cir. 1982); *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982); *Brannen v. Commissioner*, 78 T.C. 471, 501-504 (1982), affd. 722 F.2d 695 (11th Cir. 1984). In addition, since the general partners did not actively operate the partnership but gave a power of attorney to Security, the actions and motives of the individual partners are irrelevant, in any event.[12]

[12]Even if examined from petitioner's standpoint, the result would not be different. The initial material received from Carolina, though not related to OEC, was primarily tax related. Petitioner clearly understood the effect of tax credits. One of the settled issues in this case involves the "Mid South Music Tax Shelter." After learning of the OEC investment, petitioner merely looked at the appraisals briefly and made no other independent investigation. Petitioner's inexperience does not excuse him from exercising care in assigning duties to others. *Flowers v. Commissioner*, 80 T.C. 914, 932 (1983).

One of the hallmarks of economically distorted tax shelters is a purported transfer of ownership at a grossly inflated sales price. Generally, the "purchaser" executes nonrecourse notes for a large portion of the purchase price. In these instances, the transaction is so economically unfeasible or lacking in economic substance that the investor's primary or sole motivation in entering into the transaction is for the tax benefits (artificially bloated depreciation deductions and investment tax credits). The fair market value of the underlying asset could not conceivably support the purchase price, and the nonrecourse and/or contingent debt virtually assures that the price will not be paid. Thus, our opinions have focused upon fair market value of the property and the character of financing in an attempt to evaluate profit objective. See cases summarized in *Rose v. Commissioner, supra.*

This case is somewhat different from the "typical" tax shelter because benefits may be acquired under section 48(d) where no ownership interest is transferred.[13] Because the transactions in the present case involve leasing, fair market value of the energy-management devices is not, in and of itself, a good indicator of the economic feasibility of the project. However, the cash-flow analysis applied herein to judge profitability essentially determines the fair market value of the leases. Further, we must consider the economic reality of the entire transaction.

Profit means economic profit, independent of tax savings. *Herrick v. Commissioner,* 85 T.C. 237 (1985); *Surloff v. Commissioner,* 81 T.C. 210 (1983). Respondent's expert's discounted cash-flow approach, which disregards tax consequences, is an appropriate measure of this investment.

The lessee's profitability is based on a number of factors. We assume, for this purpose only, that Carolina could find end-users throughout the useful life of the energy-management systems—an assumption most favorable to petitioners. The proposed cash-flow to the lessee is based on six factors, namely: (1) Carolina's initial cash expenditure—"advanced rental" and installation expenses; (2) the end-

---

[13]While the lessee need not independently qualify for investment tax credits under sections other than 48(d), i.e., secs. 46(e)(3), 46(c)(8), *Faulkner v. Commissioner,* 88 T.C. 623 (1987), it is clear that shortcomings or defects in the lessor's qualifications under sec. 48(d) would limit the lessor's ability to pass through the credits to the lessee.

user's annual energy bill; (3) useful life of the devices; (4) anticipated savings; (5) inflation in energy costs; and (6) an appropriate discount rate. We find as ultimate facts the assumptions used by respondent's expert.

(1) Initial cash expenditures—$25,000 "advanced rental" plus $2,150 installation. The "advanced rental" figure was in the lease agreements and the installation figure was provided by the original seller.

(2) End-user's annual energy bill—$90,000. This is the minimum bill justifying use of the EMS III as provided to respondent's expert by OEC.

(3) Useful life—10 years. This is based on a combination of two factors, equipment failure and obsolescence, of both the EMS unit and the underlying air-conditioning or heating unit.[14]

(4) Anticipated savings—10 percent. While savings vary between facilities, the average is projected between 5 percent and 12 percent, with a maximum of 20 percent. In addition, in many instances the actual savings percentage is less than projected.

(5) Energy inflation—10.8 percent. This is a weighted average based on a July 1982 Department of Energy report. This report was available to the partnership prior to its December 1982 investment.

(6) Discount rate—20 percent. This is the rate at which the future cash-flow stream is discounted. It reflects risk of the venture and expected return. The prime rate in 1982 was approximately 15 percent. This is a considerably riskier venture, due to chances of equipment failure, energy cost variability, and failure to achieve savings. Twenty percent is the minimum rate of return. In the industry, a return of investment in 1 to 3 years is typical—an approximate 30-percent return.

Using these assumptions respondent's expert projected a *negative* discounted cash-flow of $13,959.[15] This finding is

---

[14]"Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes." Sec. 1.167(a)-9, Income Tax Regs.

[15]We will briefly explain the methodology used by respondent's expert in reaching his conclusions. Discounted cash-flow equals lessee's discounted percentage of energy savings minus advanced rental and installation expenses. The starting point for total energy savings is the minimum annual bill. This is projected into the future using the anticipated energy

akin to our finding in other "tax shelter" cases that the purchase price is grossly inflated. Thus, this investment makes no economic sense without the lucrative tax benefits. In other words, there could be no objective possibility of making a profit. Moreover, using methodology similar to that of respondent's expert, we find that an 18-percent energy savings rate is the minimum required to produce an economic profit, and even that requires a 15-year useful life assumption.[16]

Given a 5- to 12-percent average energy savings rate, it is highly unlikely Carolina would install an EMS system in an end-user's facility and achieve an 18-percent savings rate. There is one final significant aspect of this transaction which impedes or precludes any chance of economic profit. Comparable energy saving units could be purchased for $4,800. An end-user could merely purchase a comparable unit, have it installed, and keep 100 percent of the energy savings, instead of only 50 percent. Such a unit would pay for itself in no more than 5 years, even if the savings rate were considerably lower, and produce a greater return to the end-user.[17] These objective facts indicate that the investment was not economically viable under the terms of petitioners' lease transaction.

This transaction also may be analyzed from a different perspective. Assume, arguendo, that Carolina "purchased" the leasehold interest at a purchase price equal to the "advance rentals" plus installation charges. The purchase price ($27,150) is more than twice the present value of the expected future income stream ($13,191), using respondent's

---

inflation rate, i.e. $90,000 × 10.8 percent = $99,720—the energy bill for year 2; $99,720 × 10.8 percent = $110,490—the energy bill for year 3, and so on. The energy savings rate is then applied to each year's annual energy bill, resulting in total projected energy savings. The lessee is entitled to 10.62 percent of this figure. The lessee's portion of savings is then discounted to present value using a 20-percent rate of return. The projection is extended for 10 years into the future, the anticipated useful life of the machines. Because the rate of return is built into the discount rate, any discounted cash-flow greater than or equal to zero produces an economic profit.

[16]Our methodology varied slightly from that of respondent's expert. We did not discount the advanced rental payments and installation fees as they were paid "up front," prior to installation in an end-user's facility. We also used as an alternative an annual energy bill of $120,000, since $90,000 was the minimum justifying use of the units. The most sensitive variables affecting cash-flow to the lessee are savings rate and annual energy bill. These figures impact directly on the energy savings to the end-user. Because these variables are end-user specific, we find it curious that the materials provided by OEC did not mention the energy bill assumptions at all, and did not mention the high variability in user savings rates.

[17]This could be one reason why petitioners could not show any installations until 1983.

expert's assumptions.[18] Thus, this situation is analogous to cases in this Court holding that a grossly inflated purchase price indicates indifference towards economic profit. *Fox v. Commissioner*, 80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. *Zemel v. Commissioner*, 734 F.2d 9 (3d Cir. 1984), *Rosenblatt v. Commissioner*, 734 F.2d 7 (3d Cir. 1984), *Kratsa v. Commissioner*, 734 F.2d 6 (3d Cir. 1984), *Leffel v. Commissioner*, 734 F.2d 6 (3d Cir. 1984), and *Hook v. Commissioner*, 734 F.2d 5 (3d Cir. 1984); *Flowers v. Commissioner*, 80 T.C. 914 (1983).

In cases involving purported transfers of assets, the lack of an independent appraisal is highly indicative of indifference to economic profit. Analogously, petitioners have not shown that Carolina obtained any kind of independent cash-flow analysis.[19] Where the taxpayer is inexperienced in the area, some independent indicator of profitability would be a most probative element in any finding of a genuine profit motive. Cf. cases involving appraisals, *Beck v. Commissioner*, 85 T.C. 557, 572 (1985); *Elliott v. Commissioner*, 84 T.C. 227, 240 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); *Fox v. Commissioner, supra.* See also *Brannen v. Commissioner*, 78 T.C. 471, 508 (1982), affd. 722 F.2d 695 (11th Cir. 1984). It was not shown that Carolina had any expertise in the energy-management area. The partnership was not even authorized to enter into any business other than audio/video entertainment leasing. Cf. sec. 1.183-2(b)(2), Income Tax Regs. Moreover, everything received by the partnership should have put them on notice that the appraisals furnished relied on figures given to the "appraiser" by OEC.

Petitioners did not produce books or records of the partnership detailing operations of Carolina with regard to the EMS units. Only one end-user agreement was produced, and that was signed in 1983. There is an apparent complacency or indifference to economic profit after the

[18]Negative $13,959 discounted cash-flow plus $27,150 equals $13,191 future income stream.

[19]The analysis that was received from OEC is dated Feb. 1983, after the partnership had invested. This analysis also used figures provided by OEC and took into account tax benefits in measuring cash-flow. It warned that the latest Department of Energy figures on energy inflation should be consulted, as profitability was dependent on 15-percent energy inflation.

partnership and partners claimed the initial tax benefits. Cf. sec. 1.183-2(b)(1), Income Tax Regs. We must also conclude that Carolina never earned any profits with respect to its EMS activity because petitioners did not produce any record of earnings history. Cf. sec. 1.183-2(b)(6), (7), Income Tax Regs; *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). From this lack of evidence, and the remoteness of the possibility that this type venture could have made an economic profit, the partnership could not have entered into the transaction with the objective of making a profit. Because petitioners cannot show a profit objective with respect to the EMS activity, we uphold respondent's determination disallowing all of the claimed deductions and credits.

There are a number of other reasons why petitioners' claimed deductions and credits must fail. Credits are passed from lessor to lessee (assuming a valid election is made) as if the lessee had acquired the property at a price equal to fair market value. Sec. 48(d)(1)(A). We have found that the fair market value of an EMS I unit is $1,500, an EMS II $1,600, and an EMS III $4,800. Thus, the business energy and investment tax credits would have been limited to 10 percent of that amount.

Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.; sec. 20.2031-1(b), Estate Tax Regs.; *Chiu v. Commissioner*, 84 T.C. 722, 730 (1985). Cost would usually be good evidence of fair market value. However, the offering statement provided by OEC admitted that the purchases by OEC from Franklin New Energy were highly unusual for the industry. Thus, we find this evidence does not carry much weight. Although we do not have evidence of other EMS unit sales, respondent's expert has provided us with a number of prices for other generally comparable units and means to value them. A unit very comparable to the EMS III could have been purchased in 1982 for $4,800. Moreover, the most expensive small unit (4 to 50 points) cost approximately $8,000, and the average cost per point for small units is $305 ($7,320 for a 24-point

system). The EMS III cost $20,000 per point, more expensive than even much larger systems. The $280,000 price is at least 10 to 20 and perhaps 50 times its fair market value.

Specially defined energy property must be "installed in connection with an existing industrial or commercial facility." Sec. 48(l)(5); sec. 1.48-9(f)(2), Income Tax Regs. Petitioners are able only to show one installation which occurred in 1983, so we would disallow the energy credits on that basis.

In addition, even if profit objective could be demonstrated, we would disallow the purported "advanced rentals." Under section 162, expenses incurred must be ordinary and necessary. In order for expenses to be ordinary, the Supreme Court concluded in *Deputy v. du Pont,* 308 U.S. 488 (1940), that the payments must proximately result from, and be ordinary expenses for the conduct of, the taxpayer's alleged business. Expenses have been defined as necessary in the generally accepted meaning of that term. *Lilly v. Commissioner,* 343 U.S. 90 (1952). Paying $25,000 in advanced rent is not an ordinary or necessary expense when property similar to that rented could be purchased on the open market for under $5,000.

Respondent also contends, and we agree, that petitioners have failed to prove that any expense in addition to the $3,000 was incurred or paid.[20] Petitioners have presented no evidence to support the expenses claimed by them through Carolina. There are no checks, no bills, not even any oral testimony concerning the alleged payment of the expenses reported on the partnership return. Petitioners may not claim deductions for expenses which they cannot prove were incurred and paid by the partnership.[21]

We therefore find, from the several perspectives we have used to analyze this transaction, that no deduction or credit is allowable. This transaction possesses the usual hallmarks of economic distortion to achieve tax benefits. See *Cherin v. Commissioner,* 89 T.C. 986 (1987). Although petitioners would have us ignore the ownership attributes, including

[20]Even if petitioners had proven the expenditures, they would not have been deductible for lack of a profit motive, and/or limited to the amount of income, if any, under sec. 183.

[21]There is some doubt as to whether the units existed, and if so, where they were located. There are four leases, and one installation agreement in evidence. This is the only proof of their existence.

value, because they are a lessee without ownership, their claims for deductions and credits are based upon these attributes. We cannot ignore the fact that petitioners received income tax refunds exceeding 125 percent of their total cash investment based upon the alleged value of the underlying asset.

Petitioners have relied upon their accountant and friend, or upon the promotional materials, but we cannot ignore the artificial inflation of the claimed value of the units (between 10 and 50 times actual fair market value) and we hold that petitioners should also not have ignored it. Petitioners could have readily determined the fair market value of these units and, in the same manner, verified the assumptions and values asserted by the promoters.

We next consider the addition to tax determined for valuation overstatements. Section 6659 provides for an addition to tax equal to 30 percent of the underpayment of tax attributable to an overvaluation of more than 250 percent. The underpayment must be more than $1,000. Two hundred eighty thousand dollars is substantially more than 250 percent of $4,800, the value of the EMS units. The disallowed credits for 1982 result in underpayments of more than $1,000. Thus, the section 6659 addition would appear to mechanically apply to the disallowed credits.

At this juncture, petitioners might argue that they were not responsible for the overvaluation, if it exists, because they must rely upon the lessor under section 48(d) for this aspect of the transaction. We cannot agree. The section 6659 addition to tax applies where deductions or credits are sought based upon an overvaluation of property "claimed on any return." The plain language of section 6659 would not permit petitioners to hide behind the "misdeeds" of another. The legislative history[22] conveys the concept of a "bright line" test, independent of the taxpayer's state of mind (even if the taxpayer acted reasonably), unlike the fraud addition[23] or the negligence addition.[24] If the addition applies, the only way to avoid it is a waiver by respondent, which requires a reasonable basis for the

[22]H. Rept. 97-201, 243 (1981), 1981-2 C.B. 398.
[23]Sec. 6653(b).
[24]Sec. 6653(a).

valuation and that the value claimed was made in good faith. Sec. 6659(c).

Section 6659 only applies to returns filed after December 31, 1981. There are credit carrybacks attributable to the OEC transaction in 1980.[25] In *Nielsen v. Commissioner*, 87 T.C. 779 (1986), we held that "an item carried back from a later year to an earlier year is 'attributable to' the adjustment in the later year." The carryback is greater than $1,000. Thus, the addition also applies as to the credits carried back to 1980.

Respondent also contends that the disallowed "advance rental" deductions in 1982 contributed to an underpayment attributable to a valuation overstatement. Respondent posits that the leasehold interest constituted a property interest, therefore the rentals amounted to the value of property claimed on a return. Thus, the $100,000 advance rentals were more than 250 percent of the fair market value of the leasehold interest—approximately $19,000. The fair market value of the leasehold, respondent asserts, is no more than the fair market value of the underlying property ($4,800 times four units). We do not agree with this reading of the statute.

A valuation overstatement applies to "the value of any property, or the adjusted basis of any property, claimed on any return." Sec. 6659(c). We are unable to make the conceptual leap from deducting rental expenses to claiming the value of property on a return. Further, respondent's position is without support in the cases that have interpreted the statute. In *Todd v. Commissioner*, 89 T.C. 912 (1987), we rejected respondent's argument that section 6659 applies whenever an underpayment is attributable to a transaction involving or accompanied by a valuation overstatement. In that case, deductions were disallowed because property had not been placed in service and was held not to create an underpayment attributable to a valuation overstatement. Similarly, in *Zirker v. Commissioner*, 87 T.C. 970 (1986), we held that while disallowed depreciation deductions and investment tax credits did create an underpayment attributable to a valuation overstatement, other disallowed expenses, such as interest, did not. We disal-

---

[25]The 1980 return would have been timely filed on or before Apr. 15, 1981.

lowed the deductions and credits on the basis that no sale of cattle occurred for tax purposes; the only valuation overstatement related to the basis of the cattle.

Petitioners deducted the rental expenses as payments for the use of property. They made no claim as to the value of the underlying property. Thus, the underpayments attributable to the advanced rentals are not subject to the overvaluation addition.

The final issue is the interest imposed on tax-motivated transactions imposed by section 6621(c).[26] The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). A tax-motivated transaction includes any valuation overstatement, as defined in section 6659. Sec. 6621(c)(3)(A)(i). The underpayment attributable to the transaction must exceed $1,000.[27] Thus, with respect to the underpayments attributable to the disallowed credits, the increased rate of interest applies. Sec. 6621(c)(1).

We must next decide whether the increased rate of interest applies to the disallowed advanced rental and other expenses. We have already decided that the advanced rentals are not a valuation overstatement. The Commissioner has the authority to specify other types of transactions that will be treated as tax motivated. Sec. 6621(c)(3)(B). Deductions disallowed for any period under section 183 relating to an activity not engaged in for profit are included in respondent's temporary regulations, sec. 301.6621-2T Q-4, Temp. Proced. & Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984). See *Patin v. Commissioner,* 88 T.C. 1086 (1987). We have previously disallowed the deductions and credits related to the OEC activity because it was not engaged in with the requisite profit objective. Thus, the increased rate of interest applies to the advanced rental and other expenses.

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

[26]Prior to the Tax Reform Act of 1986, subsec. (c) was designated subsec. (d). Sec. 1511(a), Pub. L. 99-514, 100 Stat. 2085, 2744. The additional interest applies only after Dec. 31, 1984, and notwithstanding that the transaction was entered into prior to that date. *Solowiejczyk v. Commissioner,* 85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986).

[27]We previously found this with respect to the sec. 6659 issue.