FRANKLIN S. SPEARS AND REBECCA N. SPEARS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Spears v. Commissioner
Docket Nos. 43264-85, 23315-87, 1178-88
United States Tax Court
T.C. Memo 1992-78; 1992 Tax Ct. Memo LEXIS 83; 63 T.C.M. (CCH) 2017; T.C.M. (RIA) 92078; February 6, 1992, Filed *83 Decisions will be entered under Rule 155. Daniel R. Rutherford, for petitioners. Richard J. Wood, for respondent. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: By statutory notice of deficiency, respondent determined deficiencies in petitioners Dicky Huey and Cynthia Ann Huey's (the Hueys) Federal income tax and additions to tax and increased interest in the following amounts: Additions to Tax Plus Increased Interest
Sec.
Sec.
6653
Sec.
Year
Deficiency
6653(a)(1)
(a)(2)
Sec. 6659
6621(c)
1982
$ 2,921
$ 146.00
[1]
--
[2]
1983
4,287
214.35
[1]
$ 1,286.10
[2]
1984
1,953
98.00
[1]
586.00
[2]
1985
1,631
82.00
[1]
489.00
[2]
All section references are to the Internal *84 Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. By statutory notices of deficiency, respondent determined deficiencies in petitioners Franklin S. Spears and Rebecca N. Spears' (the Spears) Federal income tax and additions to tax and increased interest in the following amounts: Additions to Tax Plus Increased Interest
Sec.
Sec. 6653(a)/
6653
Year
Deficiency
Sec. 6653(a)(1)
(a)(2)
Sec. 6659
Sec. 6621(c)
1979
$  3,404.00
$   757.25
NA
$ 1,021.20
$ 1,337.10
1980
1,341.53
298.44
NA
402.46
526.97
1982
10,301.97
2,291.78
[1] 3,090.59
4,046.65
The issues in this case involve petitioners' [2] lease of energy management devices from O.E.C. Leasing Corp. (OEC or OEC Leasing). [3] After concessions,[4] the issues presented for our consideration are: *85 1. Whether petitioners are entitled to a theft loss related to the OEC venture; 2. whether petitioners are liable for the sections 6653(a) and 6653(a)(1) and (2) additions to tax in connection with their investment in OEC Leasing; 3. whether the Spears are liable for the section 6661 addition to tax for substantial understatement of income tax resulting from their OEC Leasing investment; and 4. whether petitioners are liable for the increased interest rate under section 6621(c) on tax-motivated transactions related to the OEC venture. FINDINGS OF FACT The stipulations of facts and attached exhibits are incorporated herein by this reference. Petitioners Franklin and Rebecca Spears
The Spears filed joint Federal income tax returns for taxable years 1979, 1980, and 1982. At the time their petition in this case was filed, the Spears resided in Austin, Texas. Petitioner Franklin S. Spears is a judge on the Texas Supreme Court. Petitioner Rebecca N. Spears received a master's degree in health administration and was employed as a health administrator during the taxable years in issue. Petitioner Rebecca Spears was primarily responsible for managing the couple's community *86 property affairs, including their investments, savings accounts, and retirement plans. Petitioner Franklin Spears' health began deteriorating during 1979. He underwent heart surgery during 1979 and 1981. During 1981, he suffered a stroke, resulting in dyslexia and the inability to read for a period of time. At that time, the Spears became concerned that Franklin Spears' deteriorating health would force him into an early retirement. Therefore, they began looking for additional income-producing investments. They investigated the purchase of property to operate a day care center. Petitioner Rebecca Spears contacted the Texas Department of Human Services, which oversaw the building of day care centers, and was informed about certain rules and guidelines. The Spears also entered into deferred compensation agreements to ensure a source of future income. The OEC investment was brought to petitioner Rebecca Spears' attention by her employers, Dr. Dennis and Mrs. Diane Ela (the Elas). The Elas, investors in OEC Leasing, had been introduced to the investment by Tony Sisk (Sisk), a certified public accountant, licensed securities agent, and owner of an investment company. The Spears *87 relied on the Elas' recommendation and met with Sisk in his office to discuss the OEC investment. During this meeting, the Spears also reviewed the prospectus. They sought advice from their attorney, Daniel R. Rutherford (Rutherford), regarding the OEC venture and were informed that it represented a sound investment. Relying on Rutherford's advice, petitioner Rebecca Spears' employers' recommendation, and the tax opinion in the promotional materials concerning the legality of the investment, the Spears decided to lease the 1982 model, Energy Minder System I (EMS I). On April 19, 1983, the Spears received a letter from Control Technology, Inc., stating that the corporation was the service company and would be installing their unit. The letter also stated that Control Technology was searching for a suitable location to install the energy-saving unit. The Spears believed that the service company would market the unit and locate an installation site even though the promotional material stated that the marketing, installation, and maintenance of the unit would be the sole responsibility of the lessee. On July 11, 1983, the Spears received a letter from Control Technology stating *88 that Weatherman Energy Management Company (WEM) had located a site for installation of the unit and would become the new service company. The site was purportedly located at Joe's Getty Auto in Philadelphia, Pennsylvania. The Spears paid an installation fee of $ 750 to WEM. They eventually invested approximately $ 6,000 in the OEC venture. During March 1984, the Spears learned there were problems associated with the OEC promotion. They received a letter from WEM indicating installation of the 1982 models was being stopped because of malfunctioning equipment. Shortly thereafter, the Spears learned that their unit had not been installed because it was defective. Sisk informed the Spears that a class action suit against OEC and its affiliates for fraud was being instituted and asked them to join the class. After writing numerous letters to the parties involved seeking information and stressing their dissatisfaction with the OEC Leasing venture, the Spears joined the class action suit and contributed $ 250 to the legal fund. They received $ 750, their pro rata share of the $ 1,700,000 amount recovered. The Spears did not have expertise in energy management equipment or in the *89 leasing of the same prior to their investment in OEC Leasing. They did not consult with any independent person not connected with the OEC promotion who had expertise in the energy management field or expertise in energy management equipment. The Spears have never reported any income from their lease of the EMS I unit. At the time petitioners decided to invest in OEC Leasing, they were aware of the effect of the investment tax credits. On their 1982 joint return, the Spears claimed tax credits of $ 13,000 in connection with their lease of the EMS I unit from OEC Leasing. They used $ 8,254.47 of this tax credit amount in the 1982 taxable year and filed a Form 1045 (Application for Tentative Refund) seeking a refund for tax years 1979 and 1980 in the amounts of $ 3,404 and $ 1,341.53, respectively, as a result of carrybacks. In his notice of deficiency, respondent disallowed $ 5,250 in expenses claimed on Schedule C incurred for rent and installation of an EMS I unit. In addition, respondent disallowed all regular investment tax credits and business energy investment credits in connection with the OEC investment. Petitioners Dicky and Cynthia Huey
The Hueys filed joint Federal *90 income tax returns for taxable years 1982, 1983, 1984, and 1985. At the time their petition in this case was filed, the Hueys resided in San Antonio, Texas. At the time of trial, the Hueys were divorced. Petitioner Dicky Huey is a self-employed medical doctor. Petitioner Cynthia Ann Huey is a nurse. She has also held employment as a bookkeeper. The OEC Leasing investment was brought to the Hueys' attention by their attorney, Rutherford. The Hueys, along with Sisk, several judges, and other professionals interested in investing in OEC, attended a meeting to learn more about the leasing investment. At this meeting, potential investors were informed that OEC had already made arrangements with an installment and management company. The potential investors were also informed that the investment would be profitable. The legality of the OEC venture was not discussed at the informational meeting. The Hueys read portions of the offering materials from OEC Leasing and relied on them in determining whether OEC represented a sound investment. However, they relied on the legal advice of their attorney and accountant as to whether the investment was legally acceptable. They did not *91 have expertise in energy management equipment or the leasing of the same prior to their investment. The Hueys did not consult with any independent person not connected with the OEC promotion who had expertise in the energy management field or expertise in energy management equipment. They have never reported any income from their lease of the EMS I unit. At the time petitioners decided to invest in OEC Leasing, they were aware of the effect of the investment tax credits. The Hueys' experience with OEC Leasing was similar to the Spears'. The Hueys received correspondence from Control Technology and paid the $ 750 installation fee to Control Technology. They were informed that an installation site for the unit had been selected, although they were not informed of the location of the site. However, the Hueys did not know whether the system had been installed with an end user. The Hueys never visited the selected location of their unit. They did not attempt to contact OEC and its affiliates upon learning that the unit had not been installed but met numerous times with Rutherford who in turn wrote letters to OEC Leasing on their behalf. On their 1982 joint return, the Hueys claimed *92 $ 39,000 of tax credits in connection with their lease of three EMS I units from OEC Leasing. They used $ 207 of this amount in the 1982 taxable year and carried forward $ 4,287 to tax year 1983, $ 1,953 to tax year 1984, and $ 1,631 to 1985. In his notice of deficiency, respondent disallowed $ 15,000 in expenses claimed on Schedule C incurred for advance rental fees in connection with the Hueys' investment in three EMS I units from OEC Leasing. Respondent also disallowed all regular tax credits and business energy investment tax credits claimed by the Hueys in taxable years 1982 through 1985 in connection with the OEC investment. The OEC Leasing Transaction
The OEC transaction involved the lease by a taxpayer of an energy management device from OEC Leasing, followed by its installation by a service company in the facility of an end user. Any energy savings would be split by the end user, the taxpayer, the service company, and OEC. The mechanics of the OEC transaction are identical in most respects to the transactions described in Soriano v. Commissioner, 90 T.C. 44 (1988); Rogers v. Commissioner, T.C. Memo. 1990-619; Keenan v. Commissioner, T.C. Memo. 1989-300; *93 Kaba v. Commissioner, T.C. Memo. 1989-148; Heasley v. Commissioner, T.C. Memo. 1988-408, revd. 902 F.2d 380 (5th Cir. 1990). The transaction involved the purchase by OEC of devices to save energy in industrial and commercial facilities. The promotional materials stated that a lessee of a unit had sole responsibility for marketing, installation, and maintenance of the unit. The promotional materials also outlined the estimated tax writeoff and cash benefits for a 50-percent bracket taxpayer of the EMS I as follows: Cost bases of
energy control system
$ 65,000
Advance guaranteed
rental payment
$ 5,000
Tax benefits
investment tax
credit - 10% of cost
$ 6,500
Energy tax credits -
10% of cost
6,500
Total tax credits
$ 13,000
Tax savings (50%)
on advance
guaranteed rental
payment
$ 2,500
Total tax benefits
in year of
acquisition
$ 15,500
Positive cash
benefit for year
of acquisition
$ 10,500
These projections were prepared by OEC. Each investor was advised to consult with his own professional tax adviser with respect to the projections. Any energy savings would be split by the investor and the end user, *94 with a percentage of savings retained by the service company as service fees and OEC as rental payments. The energy savings would be retained by the participants in the following percentages: End user:
50 percent   Service company:
7.5 percent Lessor (OEC):
31.88 percent
Lessee (petitioners):
10.62 percent
The end users were not required to make any payments, other than sharing energy savings, in connection with their use of the units. The investor would pay initial amounts for the first year's rental and the installation charge. The investor/lessee claimed tax deductions for advance rental fees and installation charges, and investment tax credits under section 48(d)(1) based on the purchase price OEC paid for the units. The units themselves are electronic devices designed to regulate oil, gas, steam, and electrical usage thereby conserving energy to the end user. The cost of such a system is based upon its capabilities and the number of functions it can perform. [5] During 1982, a unit comparable to the EMS I could have been purchased for approximately $ 1,500. The 1982 promotional materials contained the statement that the value of the EMS I was $ 65,000.
*95 The ultimate profitability of the venture to OEC and its lessees was dependent upon a number of factors including the initial advance rental and installation expenditures, annual energy bill, actual cost savings to the end user, the rate of inflation for energy costs, and the useful physical and economic life of the equipment. Respondent's expert's report explains these factors in greater detail. For example, the advance rental fee for an EMS I was $ 5,000 per unit, while installation was $ 1,350. The minimum annual energy bill which would justify use of the EMS I was $ 20,000. Based on a 1982 Department of Energy (DOE) report, energy costs were forecast to increase, on the average, 3.8 percent (electricity -- 2.0 percent, gas -- 9.1 percent, oil -- 4.3 percent). This is a weighted average for the typical industrial/commercial fuel combination. Considering a 7-percent inflation rate, the annual rate of energy cost increase would be 10.8 percent. DOE reports for earlier periods had projected cost increases of some 20 percent. Actual energy savings to a particular end user may vary significantly. Industry reports predicted 5- to 12-percent savings with a maximum of approximately *96 20 percent. Actual savings are often less than projected. We agree with respondent's expert that 10 percent is a reasonable assumption. An optimistic estimate of the useful life of energy management system equipment is 25 years. However, several factors reduce the useful life of the units. For example, the units in question were warranted for only 1 year. Electronic equipment is also subject to obsolescence and the outright failure of the units. These units have a useful life of approximately 10 years. Using these assumptions, one can obtain projected cash-flows for the lease of an EMS unit. One method used to measure the economic viability of these transactions is to discount this future cash-flow to present value, to take into account the time value of money. See Soriano v. Commissioner, 90 T.C. 44 (1988); Rogers v. Commissioner, T.C. Memo. 1990-619; Keenan v. Commissioner, T.C. Memo. 1989-300; Kaba v. Commissioner, T.C. Memo. 1989-148. The discount rate reflects the risk of the venture and expected return. The prime rate in 1982 was approximately 15 percent. The OEC venture was risky due *97 to the possibility of equipment failure, energy cost variability, and failure to achieve expected savings. Twenty percent would be a minimum rate of return required by investors to compensate for that risk. In this industry, an approximate 30-percent return from these systems was expected to be paid back within 1 to 3 years. Using a 20-percent discount rate, the discounted cash-flow from the lease of an EMS I, consisting of anticipated payments from end users less advance rental and installation fees, is a negative $ 3,366 as computed by respondent's expert. Moreover, under the terms of an OEC lease, an investor would experience negative cash-flow of $ 2,043, negative net present value of cash-flow of $ 3,366 and negative internal rate of return of 7.8 percent. Thus, the lease of a unit is not an economically viable transaction. OPINION Issue 1. Theft Loss
Petitioners concede that they are not entitled to the claimed deductions and credits relating to the OEC venture. However, petitioners argue that they are entitled to a deduction under section 165(a) for a theft loss for the entire amount of their investment. Petitioners contend that they are entitled to a section *98 165(a) deduction because they were defrauded of money by OEC and its affiliates. Section 165(a) provides a deduction for any loss sustained during the taxable year which is not compensated by insurance or otherwise. Petitioners are limited in the amount of their deduction to losses incurred in a trade or business, losses incurred in any transaction entered into for profit, or losses arising from casualty or theft. Sec. 165(c). Any loss arising from theft is considered as sustained during the taxable year in which the taxpayer discovers the loss. Sec. 1.165-1(d)(3), Income Tax Regs. However, where there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery during such year, the loss is not sustained until it can be ascertained with reasonable certainty whether the reimbursement will be received. Sec. 1.165-1(d)(3), Income Tax Regs.
Petitioners bear the burden of proving that they are entitled to a theft loss. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). During 1984, petitioners were informed that their energy-saving units had not been installed and that a class action suit was being instituted against *99 OEC and its affiliates. Petitioners joined the class action suit [6] and received their pro rata share of the $ 1,700,000 recovered during 1989. Accordingly, petitioners may not deduct losses sustained by them in 1982 because the loss was not discovered until 1984, and during 1984 there existed a claim for reimbursement. We conclude that petitioners are not entitled to a deduction for a theft loss during the taxable years in issue. Issue 2. Additions to Tax for Negligence
Respondent determined additions to tax under sections 6653(a) and 6653(a)(1) and (2) for negligence. Sections 6653(a) and (a)(1) provide for an addition to tax equal to 5 percent of the underpayment *100 if any part of the underpayment is due to negligence, and section 6653(a)(2) provides for an addition equal to half of the interest due on the underpayment attributable to such negligence. Negligence is the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967). Petitioners bear the burden of showing they were not negligent. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). In Heasley v. Commissioner, 902 F.2d 380, 383 (5th Cir. 1990), revg. T.C. Memo. 1988-408, the court defined "negligence" as "any failure to reasonably attempt to comply with the tax code, including the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances." The Circuit Court noted in Heasley that moderate-income investors could rely on their financial advisers and accountants and were not required to independently investigate their investments in light of investment costs. Additionally, the Circuit Court stated that investors were not required *101 to pore over every word in the promotional material, but they could exercise reasonable care by reading portions of the documents and relying on advisers to explain the rest. The court noted that this was particularly true where the taxpayers were unsophisticated. Finally, the Circuit Court considered the taxpayers' efforts to monitor their investment. Since this case is appealable to the Fifth Circuit, barring a stipulation to the contrary, we are bound by the Fifth Circuit's opinion in Heasley. Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971). The facts in this case are distinguishable from those in Heasley. In Heasley, the Fifth Circuit noted that neither taxpayer had graduated from high school, and both held blue collar jobs. We do not believe that petitioners' actions were reasonable in light of the level of their education and professional background. Petitioners were well-educated professionals. Petitioner Franklin S. Spears is a judge on the Texas Supreme Court, and petitioner Dicky Huey is a self-employed medical doctor. Petitioner Rebecca N. Spears received a master's degree, and petitioner *102 Cynthia Huey is a nurse. Petitioner Rebecca Spears testified about her professional experience in running several businesses which included hiring and firing staff and completing financial reports. Petitioner Rebecca Spears also testified that when the Spears considered investing in the day care center, they conducted an investigation by contacting the department of human resources to obtain relevant guidelines and rules prior to purchasing any assets. The Hueys attended an informational meeting along with several judges and other professionals interested in investing in OEC Leasing. The legality of the venture was not discussed at this meeting. None of the professionals questioned the legality of the transaction even though it involved an advancement of only $ 5,000 and the promotional materials stated that investors would be entitled to approximately $ 15,500 in tax benefits during the first year. Petitioners failed to show that their advisers were more knowledgeable than petitioners themselves. Petitioners did not meaningfully investigate the OEC Leasing venture. They did not consult with any independent person not connected with the OEC promotion who had an expertise in *103 energy management equipment. If petitioners had investigated the units, they would have discovered that they were worth $ 1,500 rather than the $ 65,000 claimed. Petitioners failed to examine the EMS I units before entering into the lease with OEC Leasing. Petitioners failed to adequately monitor their investment. Petitioners paid the initial advance rental fee during July 1983 and did not realize that there were problems with the investment until March 1984. The only action petitioners took during this period of time was to claim the tax benefits of the venture. Petitioners did attempt to investigate and monitor their investment after learning that the units were not installed, but we believe that petitioners were required to do more than idly wait until a problem surfaced. Issue 3. The Substantial Understatement Addition to Tax
Respondent determined a section 6661 addition for substantial understatement of income tax regarding the portion of the deficiency not related to the valuation overstatement against the Spears. [7]A "substantial understatement" exists where the amount of the understatement of income tax for the year exceeds the greater of 10 percent of the *104 tax required to be shown on the return, or $ 5,000. Sec. 6661(b). The OEC transaction is a tax shelter within the meaning of section 6661(b)(2)(C). The Spears have not shown that there was substantial authority for the position taken regarding the OEC transaction as required by section 6661(b)(2)(B)(i). The Spears also have not shown that "more likely than not" their reporting of the transaction was the "proper treatment". See Sec. 6661(b)(2)(C). Section 6661(c) permits respondent to waive the addition if the taxpayer shows reasonable cause and good faith regarding the understatement. The standard for review is whether respondent abused *105 his discretion in refusing to waive the section 6661 addition to tax. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). Abuse of discretion has been found where the denial of waiver is arbitrary, capricious, or unreasonable. See Estate of Gardner v. Commissioner, 82 T.C. 989 (1984). The advance rental deductions exceeded the $ 1,500 normal purchase price of an EMS I unit by more than three times. Accordingly, we find that there was no reasonable cause for the Spears' substantial understatement of their income tax liability. On these facts, we conclude that respondent did not act arbitrarily, capriciously, or unreasonably in not waiving the section 6661 addition to tax. In Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, the court concluded that the Commissioner abused his discretion by failing to waive the addition. As noted earlier, the facts in this case are distinguishable from those in Heasley. See supra for discussion. We also note that there was no showing that respondent was asked to waive this addition to tax. Issue 4. Increased Interest on *106 Tax-Motivated Transactions
The final issue which the Court must address is whether petitioners' entire underpayments are substantial understatements attributable to a tax-motivated transaction under section 6621(c). Section 6621(c) provides for a rate of 120 percent of the underpayment rate established under section 6621. To be subject to the rate, the underpayment for a taxable year attributable to one or more tax-motivated transactions must exceed $ 1,000. Sec. 6621(c)(2). A tax-motivated transaction includes any valuation overstatement within the meaning of section 6659(c). Sec. 6621(c)(3)(A)(i). Because respondent conceded that petitioners were not liable for the addition to tax under section 6659, section 6621(c)(3)(A)(i) is not applicable. Respondent has argued, however, that petitioners' investment in OEC is a tax-motivated transaction under section 6621(c)(3)(B). Under section 6621(c)(3)(B), the Secretary has the authority to specify other types of transactions that will be treated as tax motivated. Deductions and credits disallowed for lack of profit objective under section 183 are considered to be attributable to tax-motivated transactions. Sec. 301.6621-2T *107 Q-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984). Petitioners conceded that they were not entitled to claimed credits or deductions in connection with their investment in OEC Leasing. In his notice of deficiency, respondent disallowed the credits or deductions in part because petitioners did not have a profit objective, the units were not qualifying property, and the units were not placed in service. Because petitioners as noted conceded that they are not entitled to the deductions or credits relating to the transaction, the increased interest does not apply because it cannot be said that the underpayments were ones attributable to tax-motivated transactions within the meaning of section 6621(c). [8] See McCrary v. Commissioner, 92 T.C. 827, 857-860 (1989). See also Rogers v. Commissioner, T.C. Memo. 1990-619. *108 To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Dicky and Cynthia Ann Huey, docket Nos. 23315-87 and 1178-88. In docket No. 1178-88 the Hueys petitioned for redetermination of the deficiency and additions to tax for 1982, 1984, and 1985. In docket No. 23315-87 the Hueys petitioned for redetermination of the deficiency and additions to tax for 1983. These cases are consolidated for purposes of trial, briefing, and opinion.↩
1. 50 percent of the interest that is computed on the portion of the underpayment which is attributable to negligence or intentional disregard of rules and regulations. ↩
2. 120 percent of the interest due on any substantial underpayment attributable to a tax-motivated transaction.↩
1. 50 percent of the interest computed on the underpayment attributable to negligence.↩
2. The term "petitioners" when used in this opinion refers to all petitioners collectively, to the extent that they participated in the O.E.C. Leasing Corp. (OEC or OEC Leasing) transaction under consideration.↩
3. This case involves the same leases of energy management devices as were at issue in Soriano v. Commissioner, 90 T.C. 44↩ (1988). 4. Petitioners concede that they are not entitled to claimed credits or deductions in connection with their investment in OEC Leasing. Respondent concedes that petitioners are not liable for the addition to tax under sec. 6659↩.
5. The report prepared by respondent's expert explains these factors in greater detail, reflecting the complexity of the device. The reports of respondent's expert in this case, Soriano v. Commissioner, 90 T.C. 44 (1988), Kaba v. Commissioner, T.C. Memo. 1989-148, and Keenan v. Commissioner, T.C. Memo. 1989-300↩, are similar, and in many respects are identical.
6. To avoid repetition, petitioner Dicky Huey testified that petitioner Rebecca Spears' testimony provided an accurate description of the course of events after learning that there were problems associated with the OEC Leasing venture. Accordingly, based on that testimony, we conclude that the Hueys also participated in the class action suit.↩
7. Sec. 8002(a) of the Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, 100 Stat. 1874, 1951, increased to 25 percent the addition for substantial understatement, effective for additions assessed after Oct. 21, 1986. Because the addition will be assessed after that date, the 25-percent rate applies. Pallottini v. Commissioner, 90 T.C. 498↩ (1988).
8. We sustained respondent's determination that the taxpayers in Soriano v. Commissioner, 90 T.C. 44 (1988), were subject to increased interest under sec. 6621(c). However, in Soriano↩, we expressly found that the taxpayers were not entitled to the claimed credits and deductions because the activity was not engaged in for profit.