GARY L. WOOD, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wood v. Commissioner
Docket No. 21875-86
United States Tax Court
T.C. Memo 1990-25; 1990 Tax Ct. Memo LEXIS 25; 58 T.C.M. (CCH) 1205; T.C.M. (RIA) 90025; January 16, 1990
Gary L. Wood, pro se. Richard J. Wood and Robert N. Trqovich, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined the following deficiencies and additions to petitioner's Federal income tax: Additions to Tax
Year
Deficiency
Sec. 6653(a) [1]
Sec. 6659
1979
$ 2,365.50
$ 118.28
$ 709.65
1980
2,816.00
140.80
844.80
1981
991.00 * 49.55
-  1982
2,094.00 * 104.70
568.20
Respondent also determined that petitioner was liable for the increased interest rate on tax motivated transactions regarding the entire underpayment for 1979, 1980, 1981, and 1982 under section 6621(c), I.R.C. 1986. The issues for our consideration are: (1) *27 Whether Gary L. Wood (petitioner) should be allowed deductions and credits related to the lease of an energy management device from OEC Leasing (OEC); (2) whether petitioner is liable for the sections 6653(a) and 6659 additions to tax, as well as the section 6621(c), I.R.C. 1986, increased interest rate on tax motivated transactions related to the OEC venture. In addition to the issues generated by the OEC transaction, respondent had determined that petitioner was not entitled to one personal exemption and had failed to include $ 222 of income received from the State of California for 1982. Petitioner offered no evidence on these two adjustments and, further, petitioner, although allowed additional time to do so, did not file original or reply briefs, which the Court had requested of the parties. Accordingly, it is unnecessary to further consider these two items for 1982 because of petitioner's failure to carry his burden of proof and/or concession of these items. FINDINGS OF FACT Petitioner Gary L. Wood resided in San Pedro, California, when the petition was filed in this case. The stipulation of facts and attached exhibits are incorporated herein by *28 this reference. During 1982, petitioner by a claimed [2] payment of $ 5,000 became a general partner in a partnership which allegedly leased an energy management device known as an Energy Minder System (EMS) from OEC Leasing. Petitioner's 1982 Federal income tax return contained $ 2,625 in claimed deductions related to the OEC transaction. Two thousand five hundred dollars was for advanced rent and $ 125 for advertising. Based upon the partnership claim that the value of the energy minder was $ 65,000, petitioner also claimed $ 6,500 in tax credits on his 1982 return. Three thousand two hundred fifty dollars was attributable to investment tax credit and $ 3,250 was attributable to business energy investment credit. Because his 1982 tax liability was less than the amount of the claimed credits, he carried the difference back three years to 1979, 1980, and 1981 in the amounts of $ 2,365, $ 2,816, and $ 991, respectively. It should be noted that petitioner claimed $ 929 more in credits than were available per the amount claimed for 1982. *29 The mechanics of the OEC transaction are identical in most respects to the transactions described in Soriano v. Commissioner, 90 T.C. 44 (1988); Heasley v. Commissioner, T.C. Memo. 1988-408; Kaba v. Commissioner, T.C. Memo. 1989-148, and Keenan v. Commissioner, T.C. Memo. 1989-300. Briefly, it involved the purchase by OEC of devices to save energy in industrial and commercial facilities. These would be leased to investors, who in turn were to have them installed and serviced by an unrelated service company in the facility of a third-party end user. Any energy savings would be split by the investor and the end user, with a percentage of savings retained by the service company as service fees and OEC as rental payments. The energy savings would be retained by the participants in the following percentages: End-User:
50 percent
Service Company:
7.5 percent
Lessor (OEC):
31.88 percent
Lessee:
10.62 percent
The end user was not required to make any payments, other than sharing energy savings, in connection with their use of the devices. Prior to installation, the service company would conduct *30 an "energy audit" to determine a suitable end-user location. The investor would also pay initial amounts for the first year's rental and an installation charge. The investor/lessee claimed tax deductions for advanced rental and installation charges, and investment tax credits, under section 48(d), based on the purchase price OEC paid for the units. The units themselves are electronic devices designed to regulate oil, gas, steam, and electrical usage, thereby conserving energy to the end user. There are a number of such devices on the market. The cost of such a system is based upon its capabilities and the number of functions it can perform. The report prepared by respondent's expert [3] explains these factors in greater detail and we quote from it below: EXPLANATION OF ENERGY MANAGEMENT SYSTEM TERMS a. Number of points. A point is a physical device in the building which operates an actuator or starter [load] or measures a temperature, status or similar parameter. The number of points a system can control *31 or monitor is the most fundamental characteristic of a system for it establishes the system size. More points translates to more control, larger buildings and larger savings. Typical points for a system are: on-off control of a fan motor starter on-off control of a pump motor starter on-off control of a lighting contactor status input of a fire alarm status input of a fan failure temperature measurement of the outdoor air temperature measurement of the space. b. Functions performed. The functional capability of a system defines the extent to which the system can conserve energy and perform other tasks. Typical capabilities of systems include: Duty cycling: periodically switch equipment off for short periods of time Time-of-day: switch equipment on/off on a scheduled basis using the calendar, day of week or time of day Demand limiting: switch equipment off for short periods in order to avoid excessive (peak) electrical usage Temperature compensation: duty cycling and demand limiting can be enhanced by compensating for room temperatures Record keeping: maintaining data on utility or temperature measurements Optimum start-stop: using measured outdoor *32 and indoor temperatures to determine the optimum equipment startup or shutdown Remote access: interface to the EMS by telephone using a terminal and modem Enthalpy optimization: controlling outdoor dampers on air handling units to minimize cooling Load prediction: anticipate cycling of loads and its effect on electrical demand Low level user programing [sic]: allow for the user to define a few unique sentences using an internal language Simple building security: monitor alarms on a secondary basis and notify appropriate terminals Custom applications: special sequences established to control large equipment such as chillers and boilers Maintenance management: provide equipment database, work orders, manning reports and other related reports Full HVAC [Heating Ventilation Air Conditioning] control (Direct Digital Control (DDC)): closed loop control using a sensor and analog output to maintain temperatures Full Fire and Security: approved primary monitoring of fire and security sensors Higher level programming: Fortran, Basic or other higher level language programming. c. User Interface. The user interface impacts the ease with which the user can program the *33 above functions and monitor the results. The types of interface are: LED[4] with Keypad: The most basic user interface is a keypad with the digits 0-9 and a few other function keys and a two to six digit LED display. Often with such an interface LED point lights are used to indicated on-off status or indicate the next programming operation to take place. ASCII terminal: An ASCII terminal is a standard computer terminal with a QWERTY keyboard and CRT display or hardcopy display. This type of interface typically allows for prompting for program inputs and simple reports. Multi-terminals: This type of system allows more than one person to be using the system at a time. For example, one person may be checking the status of equipment and the other may be changing schedules. Colorgraphics terminals: A colorgraphics terminal displays equipment schematically with realtime temperatures and status in appropriate locations. The salient features and stated cost of the 1982 EMS III, the most expensive model offered by OEC) are tabulated below: EMS III
Points:
24 loads, 3 temperatures, demand input
Functions:
Duty cycling
Time-of-day
Demand limiting
Optimum start-stop
Temperature compensation
Remote access
Recordkeeping
Interface:
LED w/keypad
*34 ASCII Terminal Designated Cost: $ 280,000 Cost per Point: Approximately $ 10,000 The average cost per point for a random sampling of small units (4-125 points) is $ 305; medium units (50-750 points) averaged $ 230 per point; large custom units (500-2000 + points) vary from $ 500 to $ 1,200 per point. [5] In the general market place, the most expensive units were $ 8,213 (small) and $ 20,000 (medium). Large units must be custom built and may cost $ 50,000 or more. Installation charges may double the cost of a system. The energy management system market is a large market, heavily advertised in the trade. During 1982, a unit comparable to the EMS I, II and III could have been purchased for approximately $ 1,500, $ 1,600 and $ 4,800, respectively. The fair market value of the EMS I, II, and III (1982 models) are $ 1,500, $ 1,600, and $ 4,800, respectively. The ultimate profitability of the venture to OEC and its lessees was dependent upon a number of factors, including the initial advanced rental and installation expenditures, annual energy *35 bill, actual cost savings to the end user, the rate of inflation for energy costs, and useful physical and economic life of the equipment. The advanced rental for an EMS III was $ 25,000 per unit, while installation was $ 2,150. [6] The minimum annual energy bill that would justify use of the EMS III was $ 90,000. Based on a 1982 Department of Energy (DOE) report, energy costs were forecast to increase, on the average, 3.8 percent (electricity - 2.0 percent, gas - 9.1 percent, oil - 4.3 percent). This is a weighted average for the typical industrial/commercial fuel combination. Considering a 7-percent inflation rate, the annual rate of energy cost increase would be 10.8 percent. DOE reports for earlier periods had projected cost increases of some 20 percent. The percentages and relative figures for EMS I and II units are substantially similar. Actual energy savings to a particular end user may vary significantly, depending on physical characteristics of the *36 facility and energy conservation measures which may already have been taken. Industry reports predicted 5 to 12 percent savings with a maximum of approximately 20 percent. Actual savings are often less than projected. We agree with respondent's expert that 10 percent is a reasonable assumption. Optimistic estimates of the engineering useful life of these units is 20 to 25 years. Engineering or physical useful life is the length of time the unit may remain operational with normal repairs. The units in question were warranted for only 1 year. Electronic equipment is also subject to obsolescence (economic useful life); while the unit is still operative, it may nonetheless be more cost-effective to replace it with newer, more efficient technology. These units are also subject to obsolescence or failure of the underlying climate control units (central heating or air-conditioning units). When these are replaced the new units often incorporate internal energy management control systems. These devices have a useful life of approximately 10 years. Using these assumptions, one can obtain projected cash flows for the lease of an EMS unit. Discounting this future cash flow to present *37 value, to take into account the time value of money, is a way that has been used to measure the economic viability of these transactions. See Soriano v. Commissioner, 90 T.C. 44 (1988); Heasley v. Commissioner, T.C. Memo. 1988-408; Kaba v. Commissioner, T.C. Memo. 1989-148; Keenan v. Commissioner, T.C. Memo. 1989-300. The discount rate reflects the risk of the venture and expected return. The prime rate in 1982 was approximately 15 percent. This is a considerably riskier venture due to chances of equipment failure, energy cost variability, and failure to achieve expected savings. Twenty percent would be a minimum rate of return required by investors to compensate for that risk. In the industry, these systems are expected to pay back in 1 to 3 years an approximate 30-percent return. Using the 20-percent rate, the discounted cash flow from the lease of an EMS III, consisting of anticipated payments from end users less advanced rental and installation fees, is a negative $ 13,959 as computed by respondent's expert. [7] Thus, the lease of a unit is not an economically viable transaction. *38 Petitioner learned about the OEC "investment" through friends who were already partners. Petitioner did not possess any expertise in leasing energy management equipment, but he was aware of the tax benefits connected with the "investment." He relied solely upon information received from OEC regarding the EMS device. Petitioner did not conduct any independent investigation of the EMS device or similar devices. The partnership did not conduct any independent investigation of the energy device. It is not known whether an EMS device was in existence and/or installed in connection with petitioner's or his partnership's lease during the taxable year 1982. Neither petitioner nor his partnership took any steps to determine if the EMS unit allegedly leased had been received by an end user. Petitioner did not receive any money or revenue from his partnership investment. Petitioner spent little, if any, time and effort on the energy management equipment leasing transaction. There was and could be no expectation that the energy minder would appreciate in value. Under the terms of an OEC lease concerning energy minders an investor would experience negative cash flow, negative net present *39 value of cash flow and negative internal rate of return, as follows: Item
EMS I
EMS II
EMS III
Negative cash flow
$ 2,043.00
$ 3,829.00
$ 7,769.00
Negative net present
value of cash flow 3,366.00 8,181.00 13,959.00
Negative internal
rate of return 7.8%  5.4%. 9%  OPINION The first issue involves the propriety of deductions and credits claimed with respect to petitioner's lease of an energy management device, and the additions to tax related thereto. As previously noted, the transactions herein are similar to those already dealt with by this Court in Soriano v. Commissioner, 90 T.C. 44 (1988); Heasley v. Commissioner, T.C. Memo. 1988-408; Kaba v. Commissioner, T.C. Memo. 1989-148, and Keenan v. Commissioner, T.C. Memo. 1989-300, and suffer from many, if not all, of the same infirmities. An otherwise normal product or service, with a facially appealing and effective marketing approach, has been grossly distorted to achieve inflated and improper tax benefits and remove any underlying economic support. *40 A common threshold for the claimed tax benefits is that the taxpayer must be engaged in a trade or business or in a transaction entered into for profit. Otherwise, no credits or losses are allowed. Sec. 183. Essential to such a showing is a demonstration that petitioner had an actual and honest objective of making a profit, giving greater weight to objective facts than petitioner's mere statements of intent. Soriano v. Commissioner, supra at 53; Beck v. Commissioner, 85 T.C. 557 (1985); Siegel v. Commissioner, 78 T.C. 659 (1982); Dreicer v. Commissioner, 78 T.C. 642 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The same or similar objective factors have been used to test both profit objective and economic substance of a transaction. Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). Rather than repeat our discussion in the Soriano case, we list below the objective and subjective factors indicating that petitioner did not have the requisite profit objective. Profit means economic profit, independent of tax savings. *41 Friendship Dairies, Inc. v. Commissioner, 90 T.C. 1054 (1988); Herrick v. Commissioner, 85 T.C. 237 (1985); Surloff v. Commissioner, 81 T.C. 210 (1983). The investment tax credit is not a substitute for or component of economic profit. Friendship Dairies, Inc. v. Commissioner, supra.Therefore, we find it most probative that the discounted cash flow from the transaction, using objective assumptions, would be a negative $ 3,366. In other words, a $ 5,000 or $ 2,600 "price" is a multiple of the present value of the expected future income stream, rather than cash flow being measured against the cash price to determine the return on investment. There would be wide variability in energy savings based upon factors not within petitioner's control, including rate of energy savings, energy prices, and the installation site. Petitioner did not take an active interest in this all-important part of the investment. Rather, he passively relied on the partnership (even though he was purportedly a general partner) and did nothing after the initial investment. We would expect some minimal supervision activity, some care *42 in assigning duties to others, in order to find a bona fide profit objective. See Flowers v. Commissioner, 80 T.C. 914, 932 (1983). Petitioner did not obtain independent appraisals or other reports, nor did he do much, if any, outside investigation. Petitioner had no expertise in energy equipment leasing. In addition, petitioner did not attempt to verify or substantiate the figures provided by the promoters. Some independent indicator of profitability would be a most probative element in finding a profit objective, and that is lacking in this case. See Beck v. Commissioner, supra; Elliott v. Commissioner, 84 T.C. 227, 240 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). The units ultimately did not generate any income for petitioner. See sec. 1.183-2(b)(6), (7), Income Tax Regs. Further, there is no evidence that the unit was ever installed, and there is considerable doubt whether it was operational. Finally, the first year's advanced rental exceeded the fair market value of the entire system. Based on the foregoing, we find that petitioner did not have an actual and honest profit *43 objective with respect to the energy management lease, and no deductions or credits will be allowed. Soriano v. Commissioner, supra.
Petitioner's case also contains other defects, similar to Soriano v. Commissioner, supra.Because the fair market value of the EMS is only $ 1,500 to $ 4,800, the pass-through of the investment and energy tax credits would be limited to 10 percent of that amount. Sec. 48(d)(1)(A). There was a large market for these devices, and this market was the most appropriate barometer of fair market value. While respondent's expert admitted that installation charges could double the cost of a system, petitioner has not shown or argued that these charges would be permitted as part of the base for the energy or investment tax credits. Moreover, even if the value were doubled, it would not approach the amounts claimed by petitioner on the return, or materially reduce the deficiency. Because no installation ever occurred, no energy credits *44 would be allowed. Specially defined energy property must be installed in connection with an existing industrial or commercial facility. Sec. 48(1)(5). In addition, paying one year's advance rent in an amount in excess of the value of the entire system is not an ordinary or necessary business expense within the meaning of section 162. Soriano v. Commissioner, supra at 59. Therefore, as in Soriano v. Commissioner, 90 T.C. 44 (1988), we find that no credits or deductions are allowable. The same economic distortion that was present in that case is present here. Petitioner was interested in tax benefits, as indicated by his actions. "[W]e cannot ignore the artificial inflation of the claimed value of the units * * *. Petitioner could have readily determined the fair market value of these units and, in the same manner, verified the assumptions and values asserted by the promoters." Soriano v. Commissioner, supra at 60. Respondent also determined additions for negligence and overvaluation with respect to deficiencies related to the OEC transaction. *45 Negligence, within the meaning of section 6653(a), is the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), cert. denied 389 U.S. 1044 (1968). Petitioner bears the burden of showing he was not negligent. Petitioner claimed substantial deductions and credits based solely upon values asserted by the promoters. In addition, he was not experienced in the field of energy management equipment leasing and did not seek advice from anyone with such experience. Petitioner did not attempt to independently verify the assumptions and claims made by the promoter, including valuation of the unit, which exceeded 44 times the fair market value. Petitioner claimed the credits on his return and he is responsible for the underlying valuation. In light of the extraordinary inflation of the units and the large market for such devices, he was negligent with respect to the underpayments caused by the OEC transaction. We next consider the addition to tax determined for valuation overstatements. *46 Section 6659 provides for an addition to tax equal to 30 percent of the underpayment of tax attributable to an overvaluation of more than 250 percent. The underpayment must be more than $ 1,000. Sixty-five thousand dollars is substantially more than 250 percent of $ 1,500 to $ 4,800, the value of the EMS units. The disallowed credits for 1982 result in underpayments of more than $ 1,000. The overvaluation, exceeding 4,000 percent, was an integral part of our finding that the taxpayer lacked the requisite profit objective. See McCrary v. Commissioner, 92 T.C. 827, 851-853 (1989); Irom v. Commissioner, 866 F.2d 545 (2d Cir. 1989). Thus, the section 6659 addition would mechanically apply to the disallowed credits. Soriano v. Commissioner, supra at 60. The addition would also apply to credits carried back to years before 1982. Soriano v. Commissioner, supra; Nielsen v. Commissioner, 87 T.C. 779 (1986). Section 6621(c) imposes additional interest on tax motivated transactions. The increased *47 rate of interest is 120 percent of the statutory rate imposed on underpayments. Sec. 6621(c)(1). A tax motivated transaction includes any valuation overstatement, as defined in section 6659. Sec. 6621(c)(3)(A)(i). In addition, section 6621(c)(3)(A)(v) includes sham or fraudulent transactions within the scope of the additional interest section. Included within such transactions are those entered into without a profit motive and which were without economic substance. Patin v. Commissioner, 88 T.C. 1086 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). See also sec. 301.6621-2T Q4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 50390 (Dec. 28, 1984); Cherin v. Commissioner , 89 T.C. 986 (1987). Because the underpayments in this case were attributable to valuation overstatements, and transactions lacking in economic substance and profit objective, the additional interest applies. The additional *48 interest only applies to interest accruing after December 31, 1984. Sec. 144(a), Tax Reform Act of 1984, Pub. L. 98-369, 98 Stat. 494, 682. Increased interest accruing after the effective date of section 6621(c) attributable to an earlier year's deficiency does not constitute a retroactive application of that section. Solowiejczyk v. Commissioner, 85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Moreover, Congress can constitutionally make an income tax statute retroactive, so long as it clearly signals an intent to do so. Brushaber v. Union Pacific R.R. Co., 240 U.S. 1 (1916); Stockdale v. The Insurance Companies, 87 U.S. (20 Wall.) 323 (1873); Wiggins v. Commissioner, 92 T.C. 869 (1989). The legislative history of the statute states that "The provision is effective with respect to interest accruing after December 31, 1984, regardless of the date the return was filed." (Emphasis added.) H. Rept. 98-861 (Conf.) 985 (1984), 1984-3 C.B. (Vol. 2) 239. Respondent, for 1982, also determined additions for negligence for the underpayments not related *49 to the OEC venture. For 1982, section 6653(a)(1) provided an addition of 5 percent of the underpayment if any part of any underpayment was due to negligence. A part of the underpayments in this case was due to transactions that were primarily tax motivated. Under the circumstances of this case, taking deductions for transactions that did not have a nontax profit objective was negligent. In addition, petitioner has not proven that any part of the underpayments was not due to negligence, so that the section 6653(a)(2) additions would also apply. See Welch v. Helvering, 290 U.S. 111 (1933). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references, unless otherwise indicated, are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure. * Pursuant to section 6653(a)(1), plus 50 percent of the interest on the deficiency pursuant to section 6653(a)(2)↩.
2. It appears as though petitioner's investment, if any, would have been less than $ 5,000 because of the claimed deductions totaling $ 2,650.↩
3. The reports of respondent's experts in this case, Soriano, Heasley, Kaba, and Keenan↩ are similar, and in many respects are identical.
4. Light emitting diode. This is apparently similar to the red or green on black display on a calculator.↩
5. We use figures provided in respondent's expert's report. Costs are list price using 20 units (small) and 5 units (medium).↩
6. This figure, provided in the promotional materials by OEC, is $ 850 less than the price charged by Control in petitioner's service contract. However, this difference is not critical to the outcome of this case.↩
7. We will briefly explain the methodology used by respondent's expert in reaching his conclusions. Discounted cash flow equals lessee's discounted percentage of energy savings minus advanced rental and installation expenses. The starting point for total energy savings is the minimum annual bill. This is projected into the future using the anticipated energy inflation rate, i.e., $ 90,000 X 10.8 percent = $ 99,720 -- the energy bill for year 2; $ 99,720 X 10.8 percent = $ 110,490 -- the energy bill for year 3, and so on. The energy savings rate is then applied to each year's annual energy bill, resulting in total projected energy savings. The lessee is entitled to 10.62 percent of this figure. The lessee's portion of savings is then discounted to present value using a 20 percent rate of return. The projection is extended for 10 years into the future, the anticipated useful life of the machines. Because the rate of return is built in to the discount rate, any discounted cash flow greater than or equal to zero produces an economic profit.↩