DENNIS W. SCHILLINGER AND MONICA L. SCHILLINGER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Schillinger v. Commissioner
Docket No. 8913-88
United States Tax Court
T.C. Memo 1990-640; 1990 Tax Ct. Memo LEXIS 715; 60 T.C.M. (CCH) 1470; T.C.M. (RIA) 90640; December 20, 1990, Filed *715 Decision will be entered under Rule 155. Arthur H. Boelter and Dennis G. Riggs, for the petitioners. Nancy M. Vinocur and John Aletta, for the respondent. DAWSON, Judge. DINAN, Special Trial Judge. DAWSON
*2109 MEMORANDUM FINDINGS OF FACT AND OPINION This case was heard by Special Trial Judge Daniel J. Dinan pursuant to the provisions of section 7443A of the Code and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE Respondent in his statutory notice of deficiency issued to petitioners in this case determined *718 deficiencies in petitioners' Federal income tax and additions to tax as follows: *2110 Additions to Tax, Sections
Taxable
Year
Deficiency
6653(a)
6653(a)(1)
6653(a)(2)
6659
6661
1979
$ 6,496.00 $ 325.00
n/a n/a
$ 1,949.00
n/a    1980
7,093.00
355.00
n/a n/a
2,128.00
n/a    1982
18,593.00
n/a  $ 930.00
* 5,265.00
n/a    1983
7,418.00
n/a  371.00
* n/a  $ 1,855.00
Respondent further determined that petitioners are liable for an increased rate of interest attributable to tax motivated transactions under section 6621(c) for all taxable years in issue. In addition, by way of an amendment to his answer, respondent has asserted that petitioners are liable for an addition to tax under section 6661 in the amount of $ 4,648.00, for the taxable year 1982. Respondent has conceded that petitioners are not liable for the *719 addition to tax under section 6659 for any of the taxable years in issue. Petitioners have conceded that the assets in issue were never placed in service and, therefore, that they are not entitled to either the investment tax credit or energy tax credit claimed on their return as a result of the investment. Having noted these concessions, the issues remaining for our decision are: (1) whether petitioners' leasing activity was entered into with a profit objective under either section 162 or section 212; (2) whether petitioners' investment in the Saxon Energy Brain leasing program should be disregarded for Federal tax purposes because it was a sham; (3) whether petitioners can substantiate their claimed expenses with respect to their leasing activity; (4) whether petitioners are liable for an addition to tax for negligence under section 6653(a) for the taxable years 1979 and 1980, and under section 6653(a)(1) and (2) for the taxable years 1982 and 1983; (5) whether petitioners are liable for an addition to tax for substantial understatement of income tax under section 6661 for the taxable years 1982 and 1983; and (6) whether petitioners are liable for an increased rate of interest *720 for entering into a tax motivated transaction under section 6621(c) for all the taxable years in issue. This is a test case for approximately 150 docketed cases in which the taxpayers similarly invested in the Saxon Energy Brain program in either 1982 or 1983. The taxpayers in these other cases have executed stipulations in which they have agreed to be bound by the outcome of this case with respect to all deductions, credits, additions to tax, and increased rate of interest resulting from their investment in the Saxon Energy Brain. FINDINGS OF FACT Some of the facts have been stipulated. The stipulations of fact and accompanying exhibits are incorporated by this reference. Petitioners resided in Everett, Washington, at the time they filed their petition herein. From 1965 through the years in issue, petitioner Dennis W. Schillinger (hereinafter petitioner) was employed by Pacific Northwestern Bell (hereinafter PNB). During 1982 and 1983, petitioner was a sales manager for PNB. His job duties included supervising account executives (salespeople) who marketed products and services offered by PNB to PNB's top customers. Among the products marketed by PNB was an energy management *721 system know as the Energy Communication Service Adjunct (hereinafter ECSA) which was controlled by the Dimension PBX, a telephone switching device. The ECSA could control lights, air conditioning and heating. It also contained a clock that could schedule on/off switches, duty cycle fans, and perform load shedding. It could also control multiple units on different time schedules. Petitioner, as a sales manager of the ECSA, had some knowledge of how it operated. Petitioner's wages had been steadily rising during the years in issue. For example, petitioner and his wife, who was also employed by PNB, had wages in 1979 and 1980 of $ 52,341 and $ 74,671, respectively. However, in 1982 their wages jumped to $ 95,945 and in 1983, again jumped to $ 161,924. Petitioner had a high school diploma and had completed two years of college, where he studied psychology and mathematics. During the early 1970's, petitioner was employed part-time by H & R Block as an instructor. He taught an initial training class for income tax preparers. Prior to being an instructor, he had prepared returns for H & R Block part-time. Prior to 1982, petitioner had mainly invested in the savings plan offered *722 by PNB. In 1982, petitioner was introduced by a co-worker to Jim Cope of TRICO Financial, who was a financial advisor. TRICO was associated with a firm known as Random Processing which offered a service that prepared a quarterly analysis of a client's cash flow. The quarterly reports showed how the client disposed of income. Petitioner, through Jim Cope, utilized this service to help him track where his money went.
During 1982, Mr. Cope presented many investment possibilities to petitioner including movies, books, master recordings, authors and heavy equipment leasing. Mr. Cope first discussed the Saxon Energy Brain leasing program with petitioner in September or October of 1982. The Saxon Energy Brain leasing program offered significant tax savings in the form of investment tax credits and energy tax credits. The program can be generally described as follows. *2111 The Saxon Energy Brain, Model 001 (hereinafter Energy Brain or the unit), the asset in issue, is an energy management device. Its purpose is to duty cycle a furnace to save energy. It saves energy by turning off the furnace prior to the point the building temperature reaches the desired temperature on *723 the thermostat. This prevents the heater from overshooting that desired temperature. In other words, when the thermostat turns the furnace off because the building is at the desired temperature, there is still steam in the pipes which continues to heat the building, causing it to overheat or overshoot the desired temperature. The Energy Brain corrects this problem by turning off the heat before it reaches the desired temperature. The length of time the Energy Brain cycles the heat off per hour depends on the outside temperature. The Energy Brain determines outside temperature through sensors. If the desired temperature is 65 degrees and if the outside temperature is 65 degrees, the Energy Brain would cycle the heat off continuously for the hour. If the outside temperature was at the minimum, say five below zero, the Energy Brain would not cycle the furnace off at all during the hour. If the outside temperature was somewhere in between, the Energy Brain would cycle the furnace off a percentage of the time depending on the relative outside temperature. The Energy Brain was manufactured by microprocessor Based System Design and Manufacturing (CS&M) of Ludlow, Massachusetts. CS&M *724 would purchase most of the labor-intensive sub-assemblies which went into the Energy Brain and then assemble the sub-assemblies into a finished unit. Thereafter, the units were sold to Enersonics, Inc. (hereinafter Enersonics). Enersonics may have done some final assembling itself. Enersonics eventually sold the units to Saxon Energy Corp (hereinafter Saxon). Enersonics and Saxon were under the common control of Sheldon Barr and Leonard Friedman. Enersonics agreed to sell the units exclusively to Saxon and Saxon agreed to purchase units exclusively from Enersonics. The purchase price of the Energy Brain was $ 80,000. The agreement required Saxon to pay the purchase price with $ 4,000 down and a note for the balance, secured by the unit. The note would be due in 25 years at an 8 1/2-percent simple interest rate. The agreement required Saxon to prepay the interest to the extent it received lease payments from the units. The note was secured by a security agreement between Enersonics and Saxon. The security agreement was subordinate to any third party lease entered into by Saxon and if Saxon defaulted on the lease, the third party would be required to pay Enersonics directly. *725 Saxon offered to lease the Energy Brain it had purchased to interested investors. An interested investor would lease the unit from Saxon and then sublease it to an end user. Typically, the end user would be the owner of a building who wanted to install an Energy Brain. The end user would pay for the unit by agreeing to split the amount of the energy savings 50-50 with the lessee. The lessee would not find an end user, install, or manage the unit himself but rather would enter into an agreement with a management company to manage the unit. Saxon had a list of management companies available to its lessees. In petitioner's case, he chose ALH as his management company. ALH was owned by Kamal Fereg. Mr. Fereg was also associated with Saxon. The agreement between ALH and the lessee required the lessee to remit 15 percent of his gross revenues from the unit to ALH as a management fee. If the lessee received no gross revenues he was not required to pay any management fees. There was no provision in the management agreement restricting or directing ALH to place the unit in a location that would have heating costs sufficient to provide the lessee with a positive cash flow from energy *726 savings. The terms of the lease required the lessee to pay Saxon an advance lease payment of $ 10,000. This payment covered the first year. The lease then required the lessee to make lease payments in the amount of 75 percent of the lessee's gross revenues less the management fee after the first year with a minimum payment of $ 2,500. The lease payments were payable out of the gross revenues only. If the Energy Brain did not generate any energy savings, the lessee would not be required to make any lease payments. However, the minimum rental of $ 2,500 per year would accrue, interest free, until such time that the lessee received gross revenues from the unit. If the minimum rentals were not paid by year 10, Saxon had the right to terminate the lease. The lease was for a term of 20 years. At the time the lessee entered into the agreement with Saxon to lease the unit, the lessee and Saxon would agree to pass both the investment tax credit and the energy tax credit from Saxon to the lessee. Saxon agreed to insure the units for the first year. Thereafter, the lessee was required to insure his units. The lessee bore the risk of loss with respect to the units and agreed to indemnify *727 Saxon from any liability. Petitioner reviewed and relied on three documents prepared by Saxon when making his decision to invest. The first was an Offering Memorandum. Included in the Offering Memorandum was a list of suitability requirements of the potential lessee, a description of the program, a description of the risk factors, a background of the lessor, a summary of tax consequences, and a 14 page tax opinion from *2112 the law firm of Falk & Berman in New York, New York. The second document prepared by Saxon was a pamphlet of Frequently Asked Questions (and answers) about the Energy Brain. The questions and answers included a description of Saxon, an explanation of the Energy Brain, an explanation of the available tax credits, the effect of the tax laws on the program, a brief statement about the potential profit making ability of the program, marketing, service companies, and instructions on how to learn more about the Energy Brain. The third document prepared by Saxon was a single piece of paper entitled "Tax Credits Carryback Illustration." This document demonstrated the potential tax savings an investor would be entitled to if he invested in the Energy Brain. *728 The example assumed that a potential investor paid Federal income tax of $ 10,000, $ 12,000, and $ 14,000 for the taxable years 1979, 1980, and 1981, respectively. The example further assumed that the investor would have total income in 1982 of $ 75,000, and without investing in the Energy Brain, would have to pay Federal income tax of $ 18,685. However, if the investor invested in an Energy Brain with a fair market value of $ 240,000 (a Model 002) and paid an advance lease payment of $ 28,600 and a locator fee of $ 1,000, the investor would reduce his taxable income to $ 32,400 (including exemptions), which would reduce his tax to $ 7,000. In addition to being able to deduct the advance lease payment and locator fee, the investor in the example would be entitled to an energy tax credit and investment tax credit totaling $ 48,000. This would reduce the investor's 1982 tax to zero and could be carried back to reduce his 1979, 1980, and 1981 taxes to zero. There would also be $ 5,000 worth of credits to carry forward to reduce taxes in future years. The total projected tax savings, including the tax credits and the advance lease payment and locator fee deductions, was $ 59,685. *729 After subtracting the cash outlays of $ 29,600 (the advance lease payment and locator fee), the investor would be ahead by $ 30,085. It was also pointed out in the illustration that these savings were exclusive of any potential savings in state income taxes. As previously found, petitioner was introduced to the Saxon program by Jim Cope, a financial advisor. Mr. Cope received a 10-percent commission for selling the units. Mr. Cope created a "due diligence" kit which was a file of all the information he had gathered with respect to the program. Mr. Cope passed much of this information on to petitioner which, in turn, influenced petitioner's decision to invest. Included in this file were two appraisals of the Energy Brain by Kamal Fereg which purported to show that it was worth $ 80,000. Other documents in the "due diligence" file included articles on energy management, performance data, correspondence with Saxon, information about Saxon including financial stability, corporate organization, credit history, information on ALH, and other information about the program. Mr. Cope told petitioner that he had to invest by year-end. Petitioner, in his notes that he kept of conversations *730 with persons involved with this program, wrote down that the last day on which he could make the investment was "12-31" and that his check had to have that date on it. Mr. Cope obtained much of his information from the West Coast promoter of Saxon, Richard Bell. Mr. Bell was a financial advisor, venture capitalist, and promoter. He also had a background in engineering. Mr. Bell had flown to New York to investigate Saxon and ALH to ascertain whether they were viable operations and had spoken with some of the principals of Saxon and ALH. Petitioner spoke with Mr. Bell directly on several occasions to acquire information that Mr. Cope could not provide. After consulting with Mr. Bell and Mr. Cope in the late months of 1982, petitioner decided to invest in the Saxon Energy Brain, Model 002. This model was more sophisticated than the Model 001. Once petitioner had decided to invest in the program, he contacted Mr. Cope who sent him a number of documents to fill out. Included in these documents were an Agreement of Lease, Election to Pass Investment Tax Credit from Lessor to Lessee, Lease Application and Lessee's Qualification Questionnaire. All the forms are self-explanatory *731 except for the Lessee's Qualification Questionnaire. This form basically solicited information to help Saxon determine if the potential investor that Saxon was interested in fit the taxpayer profile. Information requested included the investor's name and address, occupation, business address, whether the investor's current net worth exceeded $ 150,000 exclusive of home, furnishings and automobile, whether the investor was in the 50-percent marginal tax bracket, the investor's educational level, current employment, principal business activities, professional licenses, experience in financial and business matters and whether the investor relied on the advice of others in making the investment. In filling out the form, petitioner indicated that he met the net worth requirements and was in the 50-percent marginal tax bracket. In response to the question regarding his experience in financial and business matters, petitioner stated that one piece of equipment which he sold through his employer was an energy management device and that he was familiar with its concept. He also explained in response to that same question that he had an "extensive background in the regulations and preparation *732 of personal income *2113 tax having instructed on tax preparation at H & R Block." Approximately two weeks prior to investing in the Model 002, petitioner had contacted Ken Secrest, an accountant, regarding the tax aspects of the Saxon program. Petitioner gave Mr. Secrest the Information Memorandum, the Frequently Asked Questions pamphlet and the Tax Credits Carryback Illustration. On December 23, 1982, petitioner met with Mr. Secrest. Mr. Secrest advised petitioner that he thought the investment was very aggressive and that if the IRS disallowed it, petitioner could face substantial additions to tax. Mr. Secrest did not advise petitioner that the unit was overvalued, but did advise him that there was a risk of being assessed additions to tax by the IRS because of overvaluation. The next day petitioner contacted Mr. Bell and Mr. Fereg to discuss with them his concerns about the possible adverse tax consequences if he invested in the Saxon program. Mr. Fereg advised petitioner that he might be better off investing in the Model 001 because it seemed to be more marketable. Petitioner then called Mr. Cope to inform him that he had changed his mind about investing in the *733 Saxon program after having talked to Mr. Fereg and Mr. Secrest. Mr. Cope then investigated the questions petitioner had raised with respect to the valuation and related tax problems. The next day petitioner met with Mr. Cope and Mr. Cope assured him that the investment was sound from a tax perspective because other clients had been audited and the IRS accepted the investment as legitimate. On December 27, 1982, even though he still had reservations about the program, petitioner decided to invest in two Energy Brains, Model 001. Utilizing some of the documents he had filled out for the Model 002 and some additional documents prepared by Mr. Cope, petitioner leased two Model 001 Energy Brains. The leases required an advance rental payment of $ 10,000 per unit. Petitioner purchased a cashier's check for $ 10,000 and executed a note for the remaining $ 10,000 advance lease payment. This note bore a 10-percent interest rate and was due on June 15, 1983. Petitioner paid the $ 10,000 note on June 12, 1983, together with interest of $ 600. Also, on December 27, petitioner selected ALH to manage the units and paid ALH $ 1,000 as an initial management fee. Petitioner deducted a small *734 portion of the advance lease payment and management fee in 1982 and deducted the remainder in 1983. Petitioner and his wife purchased the units in the name of D & M Investment Co.
Petitioner retained Mr. Secrest to prepare his 1982 Federal tax return. Mr. Secrest advised petitioner to attach a copy of the Falk & Berman tax opinion letter with his return to provide adequate disclosure, which petitioner did. Petitioner had also given the tax opinion letter to his attorney, Patrick Cerutti, who reviewed it. Mr. Cerutti, both orally and later in a written letter, informed petitioner that he agreed with the tax opinion letter, except for the pass-through of the tax credits, where he had some concerns. The unit was not placed in service within the next four days. Throughout 1983 and 1984, petitioner inquired of Kamal Fereg whether his units had been placed with an end user. He received inconsistent responses from Mr. Fereg who continually promised petitioner that the units had been placed or that an end user had been located and that they would soon be placed. Petitioner kept meticulous records of his correspondence with Mr. Fereg concerning the placement of the units. He did *735 this, at least in part, on the advice of Mr. Cope and his attorney, Patrick Cerutti, who both advised petitioner that keeping accurate records would help show that he was in a business for profit. Mr. Cerutti said in a letter dated February 10, 1983, that, "As we discussed, it would be important for you to keep accurate records of correspondence, telephone conferences and other activities reflecting the fact that you are actively engaged in a trade or business for profit in connection with this information." Mr. Cope gave petitioner similar advice in a letter dated January 19, 1983. He stated, This is a short letter regarding your "Energy Brain." We suggest that you call your service company, ALH Energy * * *, [or] Garo Electric * * *, and ask several questions which should be of interest to you regarding where your device will be placed, when and the expected savings generated. This also shows that you are taking an active interest in your investment company. Record in your business diary the phone call, date and time, to whom you spoke and the subject matter. This again, is important for your investment company. * * * Petitioner's units were never placed in service. *736 Petitioner never saw his units and does not know whether they ever existed. Furthermore, even though he bore the risk of loss with respect to the units and even though Saxon did not insure the units after the first year, petitioner never procured any insurance for his units. Petitioner, pursuant to the lease between himself and Saxon, was required to pay Saxon 75-percent of his net revenues from the placed units. However, petitioner never received any inquires from Saxon regarding the lease payments even though Saxon should not have *2114 known that the units were never placed with an end user. On his 1982 Federal income tax return, Schedule C, petitioner reported the following expenses with respect to his investment in the two Saxon Energy Brains.
Car expenses
$ 101.00 Legal and Prof. fees
70.00
Office supplies
60.00
Rent on Business Property
833.00
Util. and Telephone
12.00
Consulting Fee
1255.00
Management Fee
42.00
Total        2373.00
Petitioner also claimed an investment tax credit of $ 16,000 (10-percent of $ 160,000) and an energy tax credit of $ 16,000 (10-percent of $ 160,000) on his 1981 return. However, because his *737 tax was only $ 17,410, he could only utilize the credits to that extent. Petitioner knew, at the time he filed his return, that his units had not yet been placed in service with an end user. On his 1983 Federal income tax return, Schedule C, petitioner reported the following expenses with respect to his investment in the two Saxon Energy Brains: Car and Truck Expenses
$ 51.00    Freight
44.00
Interest
600.00
Legal and Prof. fees
135.00
Rent on business property
19,167.00
Util. and Telephone
193.00
Financial Consultant
650.00
Management Fee
958.00
Total        21,798.00
Petitioner carried back the unused portion of the tax credits ($ 14,590) to the three preceding years: 1979, 1980 and 1981. Petitioners called two experts to the stand in their case-in-chief. Their first expert was Harold Rind. He opined that the Energy Brain had a 20 year useful life, that it worked best with steam heat and that it could achieve approximately 25 to 40-percent in energy savings per year. In his expert report, Mr. Rind undertook to determine the return petitioner would earn on his investment if he placed the units with an end user that used 40,000 *738 gallons of fuel per year at a cost of $ 1.00 per gallon. Mr. Rind obtained this 40,000 gallon fuel usage figure from the Saxon promotional material. He assumed that fuel costs would increase by 10-percent per year and that the Energy Brain would save 35-percent in fuel per year. Using those assumptions, he arrived at a return per year to the investor after having split the savings 50-50 with the end user and after having paid the management fee (15-percent) and the lease payments, including the initial lease payment (75-percent and $ 10,000 respectively). Mr. Rind next discounted each year's return by 20-percent to the present value, for a net present value of $ 13,064. In his second example he assumed a fuel savings rate of 27-percent, which produced a net present value of $ 1,854. The data on which Mr. Rind computed his energy savings was given to him by Frank Leja, a Saxon promoter. Mr. Rind could not independently verify the data because it was several years old and the restaurants it was taken from had gone out of business. Mr. Rind testified that a competitor's energy management device, the Tour and Andersson Unit 210C, was comparable to the Saxon Energy Brain, Model *739 001. In 1982, the Tour and Andersson Unit 210C sold for approximately $ 1,000. Mr. Rind also testified that it would cost about $ 1,000 to install an energy management device. Thus, an end user could purchase and install an energy management device for approximately $ 2,000, an amount significantly less than the energy savings the end user would have to pay the lessee for the use of the Saxon Energy Brain. Petitioners' second expert, James Augustyn, using essentially the same assumptions as Mr. Rind, arrived at a cumulative present (1982) value of the lifetime operation of an Energy Brain of $ 1,742 as a return to the investor. Included in the assumptions was a 20 year useful life, 35-percent energy savings and a 20-percent discount factor. Mr. Augustyn similarly assumed a fuel usage of 40,000 gallons per year. He obtained this fuel usage information from Mr. Rind. In his second and third examples, respectively, Mr. Augustyn assumed a 30-percent energy savings which produced a cumulative present value of lifetime operation of $ 702 and a 40-percent energy savings which produced a cumulative present value of lifetime operation of $ 2,783. Mr. Augustyn agreed with Mr. Rind's *740 opinion that a comparable energy management system could have been purchased for approximately $ 1,000 in 1982. Respondent called one expert to the stand, Susan Hazelhorst. Ms. Hazelhorst opined that the Saxon Energy Brain had the exact same specifications as the Tour and Andersson Model 210C. The only difference was cosmetic. The Saxon Energy Brain had all of its control knobs on the exterior while the Tour and Andersson Model 210C had some of its control knobs behind the face plate. She also stated that the Tour and Andersson Model 210C retailed for $ 795 in 1982 and was available to the trade for $ 475 (cost to an installer or distributor). Ms. Hazelhorst also opined that a product's useful life and its operational life are two separate concepts. Useful life considers how long a *2115 product will be used while operational life considers how long a product could operate. Because of technical obsolescence, a product's useful life will often be shorter than its operational life. Ms. Hazelhorst thought that the Saxon Energy Brain's useful life would be 15 years. Ms. Hazelhorst was also of the opinion that in using the Energy Brain, energy savings of six-percent *741 would be average and energy savings of 15-percent would be optimistic. Ms. Hazelhorst also undertook to perform a cash flow analysis and net present value calculation of the Saxon Energy Brain leasing program. It was her opinion that a restaurant of the type an Energy Brain would be placed in would never use enough fuel to justify an Energy Brain. For example, if the unit were placed in a typical sunbelt state restaurant, it would only use $ 300 worth of natural gas (for heating) per year. Taking into consideration the terms of the leasing arrangement, it was Ms. Hazelhorst's opinion that the net present value of petitioner's return would be a negative $ 15,512. She arrived at this figure using a 15-percent energy savings rate, a 15 year useful life and a 20-percent discount rate. She also assumed that natural gas costs would rise at a rate of 16.1-percent per year. Ms. Hazelhorst was also of the opinion that an Energy Brain would work best when placed in an old, Northeast apartment building. She thought that if the building used natural gas, it would use $ 15,100 worth (for heating) per year. Using the same assumptions as she used in the restaurant example, she arrived *742 at a net present value of negative $ 10,650. If the apartment building used fuel oil instead of natural gas, it was her opinion that the net present value of the investor's cash flow would be a negative $ 9,907. In her fuel oil example, she used the same assumptions as in the natural gas example except for fuel cost which was $ 21,500 and increases in fuel cost which was 11.3-percent. In all her examples, Ms. Hazelhorst assumed that the lessee would have to pay Saxon a minimum lease payment of $ 2,500 in year one. This is in error because there was no such payment due in year one. Therefore, all of her net present values must be increased by $ 2,500. Furthermore, Ms. Hazelhorst explained that there were dozens of energy management devices on the market at the time petitioner leased the Saxon Energy Brain. Of all those numerous devices, it was her opinion that the Energy Brain was on the low end of the scale in terms of sophistication and function. After hearing the testimony of the above-mentioned three experts, petitioners called Walter Zweifler to testify in rebuttal. Mr. Zweifler was of the opinion that it was more appropriate to value the Energy Brain on a discounted *743 cash flow method than a comparable cost approach. The following questions and answers are taken from Mr. Zweifler's cross-examination regarding valuation: Q. From an economic point of view, if it's established that this system could have been purchased for $ 800 to $ 1,000 anywhere on the open market, isn't it a fact that that is the value of the system? A. Absolutely not. From an economic point of view, it has absolutely nothing whatever to do with what someone might pay for this product, and what are the psychological things, from an economic point of view, that would prompt him to buy it at the price it's been offered at. Q. From an economic point of view, does it make any sense for an investor to lease a system worth $ 800 and pay, in first year's lease cost alone, $ 10,000? A. From an economic point of view, there is some question in the mind of the investor as to whether they are exactly comparable from an economic point of view. And that is by no means an established fact, and a going-in assumption that he could rely on without any reservation. And when a person decides to buy something, his propensity to pay, and his elasticity, his price elasticity, *744 are based on a lot of factors, not the least of which is the things which I have mentioned earlier.
We have totally disregarded Mr. Zweifler's sophistic reasoning in deciding the issues in this case. ULTIMATE FINDINGS OF FACT The Saxon Energy Brain had a fair market value in 1982 not in excess of $ 1,000. Petitioner's objective in investing in the Saxon Energy Brain leasing program was solely to gain a significant tax advantage and not to earn an economic profit. OPINION The determination of respondent, as contained in his statutory notice of deficiency, is presumed to be correct. Petitioners bear the burden of proving that respondent erred in his determination. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). The first issue for decision is whether petitioners undertook their leasing activity with a profit objective under either section 162 or section 212. Section 183(a) provides that if an activity "is not engaged in for profit" then no deduction attributable to such activity is allowed except as provided for in that section. An "activity not engaged in for profit" is defined as an activity other than one with respect to which deductions *745 are allowable under section 162 or under *2116 paragraphs (1) or (2) of section 212. Sec. 183(c). In other words, section 183 does not apply if petitioner's activity gives rise to deductions under section 162 or section 212(1) or (2). Deductions are permitted under those sections if an activity is commenced and continued with the "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). While a reasonable expectation of profit is not required, the taxpayer's profit objective must be bona fide. Allen v. Commissioner, 72 T.C. 28, 33 (1979). Whether petitioner had an actual and honest profit objective is a question of fact to be resolved from all of the relevant facts and circumstances. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. in an unpublished opinion 647 F.2d 170 (9th Cir. 1981). The same or similar objective factors have been used to test both profit objective and economic substance of a transaction. Rose v. Commissioner, 88 T.C. 386 (1987), affd. 868 F.2d 851 (6th Cir. 1989). *746 Profit means economic profit, independent of tax savings. Herrick v. Commissioner, 85 T.C. 237 (1985). Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of relevant factors, which is a synthesis of prior case law, to be considered in determining whether an activity is engaged in for profit. Benz v. Commissioner, 63 T.C. 375, 382-383 (1974). These factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer carries or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is controlling, but rather it is an evaluation of all the facts and circumstances in the case, taken as a whole, *747 which is determinative. Sec. 1.183-2(b), Income Tax Regs.; Abramson v. Commissioner, 86 T.C. 360, 371 (1986). In addition to the foregoing factors, in other comparable energy management leasing cases, we have examined the discounted cash flow to the investor as evidence of an economic profit objective. Soriano v. Commissioner, 90 T.C. 44 (1988). We turn first to determining whether petitioners' leasing activity could have produced a positive discounted cash flow. Petitioners' experts both arrived at a positive discounted cash flow. In arriving at his conclusion, petitioners' first expert, Mr. Rind, assumed the end user consumed 40,000 gallons in heating fuel per year and that the cost of the fuel would rise 10-percent per year. He also assumed that the Energy Brain would save 35-percent per year in heating costs and that the useful life of the units was 20 years. Petitioners' second expert, Mr. Augustyn, used basically the same assumptions as Mr. Rind. Repondent's expert, Ms. Hazelhorst, was of the opinion that the maximum energy savings possible when using the Energy Brain was 15-percent. She also thought that *748 the unit's useful life was a maximum of 15 years because of technical obsolescence and that natural gas prices would rise at a rate of 16.1-percent per year and fuel oil prices would rise at a rate of 11.3-percent per year. The assumption Ms. Hazelhorst used which was most at odds with petitioners' experts concerned how much heating fuel an end user would consume per year. If the unit was placed in a restaurant in the Western part of the United States, she thought that it would only use $ 300 in heating fuel per year. If the unit was placed in an apartment building in the Northeastern United States, she thought it would use $ 15,100 worth of natural gas per year in heating. If the building used fuel oil in the same location, she thought it would use $ 21,500 worth of oil per year. Obviously, whether the leased Energy Brain generated a positive or negative discounted cash flow to the investor depends on whose assumptions are more accurate. Mr. Rind obtained his fuel usage from Saxon. He offered no independent verification of the amount. Ms. Hazelhorst's explanation of fuel usage for various buildings was reasonable and persuasive; accordingly, we accept it as fact. As for energy *749 savings, again Mr. Rind based his opinion on data given him from Saxon. Ms. Hazelhorst came to her conclusion on this point based on a large scale study done by her consulting firm. Mr. Rind did not independently verify his conclusion and accordingly, we find it flawed. Ms. Hazelhorst's opinion was based on a large scale energy audit. Again, we find it reasonable and persuasive and, accordingly, find it as fact. As for useful life, again Mr. Rind took the figure given to him by Saxon. The 20-year useful life Mr. Rind used corresponds with the length of the lease. He did not independently verify that it was accurate. Ms. Hazelhorst, on the other hand, said that technical obsolescence would cause the Energy Brain's useful life not to exceed 15 years. Again we find her opinion reasonable and independent and find it as fact. Based on a 15-year useful life and 15-percent energy savings and based on fuel oil consumption of $ 21,500 per year increasing at 11-percent *2117 per year, our calculations show that the discounted cash flow of petitioners' income stream would be negative. [2]
*750 In this type of leasing transaction, if the discounted cash flow is negative, we have consistently found that because of that the investor could never earn a profit. Soriano v. Commissioner, 90 T.C. 44 (1988). See also, Wood v. Commissioner, T.C. Memo. 1990-25; Keenan v. Commissioner, T.C. Memo. 1989-300; Pacheco v. Commissioner, T.C. Memo. 1989-296. Kaba v. Commissioner, T.C. Memo. 1989-148; and Heasley v. Commissioner, T.C. Memo. 1988-408, rev'd. 902 F.2d 380 (5th Cir. 1990). In other words, applying an objective standard, given the parameters of the leasing program, petitioner could not have earned an economic profit and, therefore, did not have the objective to earn an economic profit. Soriano v. Commissioner, supra at 56. Petitioners argue, nonetheless, that they should be entitled to the deductions because, from a subjective point of view, they had an objective to earn a profit. The evidence proves otherwise. We have found as a fact that the fair market value of the Energy Brain, Model 001, was not in excess of $ 1,000 in 1982. *751 We base this conclusion on the fact that both petitioners' experts and respondent's expert testified that a comparable product was widely available off the shelf for sale at that price. We attach no weight whatever to petitioners' rebuttal expert who opined that fair market value should be based on a discounted cash flow when a comparable product was widely available off the shelf. For reasons which should be readily apparent, we find that Mr. Zweifler's methodology was flawed and his conclusion nonsensical. While the relationship between fair market value and purchase price does not have the same impact in leasing transactions as it does with purchases financed with nonrecourse debt, it is a factor in determining whether a taxpayer had a profit objective. Soriano v. Commissioner, supra at 58. It is hard to imagine that petitioner had the objective to earn a profit from an investment where the advance lease payment was 10 times the fair market value of the asset and where each year's minimum lease payment was twice the amount of the asset's fair market value. Petitioner is an intelligent, savvy investor who, at the time he invested, was a highly paid telephone *752 company executive looking to shelter income. In his job he marketed energy management systems. Presumably, he was familiar with its concept. He had also worked for H & R Block, which gave him a working knowledge of the rudiments of Federal taxation. He was not, as he tried to portray himself, an innocent investor taken in by slick Saxon promoters. The promotional materials he reviewed were replete with promises of tax savings, yet short on promises of economic return. In the "Tax Credits Carryback Illustration" example, it was explained that the investor could expect to double his money based on Federal tax savings alone. Yet discussion of economic return was minimal. Simply put, it was a tax shelter. A person puts up so much money and receives back twice the amount in tax savings. No one was concerned with actually managing the units because that was not part of the equation. From an economic point of view, petitioner never would have invested in the Energy Brain if it were not for the 100-percent return from Federal tax savings. Furthermore, petitioner was somewhat aware of the market for energy management devices since he marketed them for PNB. We do not believe that *753 he thought he could earn a profit on a device where the advance lease payment was 10 times its fair market value. He had to have known that an end user could have gone out and purchased a comparable unit for $ 1,000 and had it installed for much less than what the end user would have had to pay the lessee (investor) in energy savings. Yet, that fact did not deter him because his return did not come from placing the unit with an end user, it came from tax savings. *2118 Petitioner points out that he kept meticulous records of his conversations with various persons associated with the program which shows that he actually intended to make money from this investment. We are unpersuaded. This so-called "paper trail" was just that, nothing more. It goes more to show that he was a sophisticated investor who was more concerned with covering up his true objectives by papering them over with telephone logs than with placing his units. The telephone logs were created because of the advice of petitioner's advisors to give the impression that he was honestly trying to place the units to make money from them. If petitioner had truly been concerned about his two $ 80,000 units he would *754 have insured them. As the lease was written, petitioner bore the risk of loss if anything happened to the units. But Saxon only insured them for the first year. Petitioner never made any attempt to insure them thereafter. Petitioner also argues that even if he received a significant tax benefit, if his units had been placed he would have earned a profit. As we pointed out earlier, his discounted cash flow was negative, meaning that he could never earn a profit from the units. The entire scheme was designed so that all parties came out ahead without anyone being exposed to personal liability. Petitioner invested at yearend in order to obtain the hefty tax credits without regard to whether the units were actually placed in a suitable location. His objective was to earn a profit through tax savings, not through actually placing the units with an end user and earning a profit from energy savings. Accordingly, all the expenses he deducted as a result of his investment in the Energy Brain are disallowed (except the interest) because he did not have a profit objective under either section 162 or section 212. Under section 183(b), expenses, the deductibility of which is not dependent *755 on a profit objective, are deductible even if the taxpayer did not have a profit objective. Petitioners paid $ 600 in interest on a note executed to finance half of the advance lease payment. Interest is deductible under section 163. Accordingly, petitioners are entitled to that deduction. Having decided that petitioners are not otherwise entitled to the claimed deductions because they lacked a profit objective, we need not decide whether petitioners' investment should be disregarded as a sham or whether petitioners can substantiate their deductions. The next issue for decision is whether petitioners are liable for the addition to tax for negligence. Negligence, for the purposes of this addition to tax, is defined as the lack of due care or the failure to do what a reasonable or ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 937 (1985). Petitioner was a sophisticated, prosperous investor who was familiar with the concepts of Federal taxation. He worked in the Energy Management field and was somewhat familiar with the market. On his returns for the years in issue, he claimed tax credits based on the value *756 of assets which was 80 times their fair market value. He also claimed the credits even though he was aware that the units had not been placed in service during the 1982 taxable year. He participated in this scheme to earn a profit on tax savings. Clearly he was negligent. Petitioner argues that he relied on the advice of experts when deciding to invest and, therefore, exercised due care and was not negligent. Three of his advisors, Mr. Cope, Mr. Bell and Mr. Fereg were either directly associated with Saxon or were promoters of Saxon. Theirs was not advice, it was sales propaganda and should have been taken as such. Petitioner also claims to have relied on his accountant who reviewed the promotional materials. His accountant thought the investment was very aggressive and that if it was questioned by the IRS, petitioner could have faced substantial additions. The accountant did not advise petitioner that the investment was sound from a tax perspective. In fact, the opposite was true. After petitioner had talked to his accountant, he thought of abandoning the investment. It took reassurances from the promoters to keep him from pulling out. Petitioner did not rely on his accountant's *757 advice when making the investment and will not be relieved of the addition to tax for negligence in that regard. Petitioner also gave the promoter's tax opinion letter to his attorney who reviewed it and told petitioner that he agreed with it. Again the attorney did not advise petitioner to invest. He simply rubber-stamped the promoter's opinion. Petitioner will not be relieved of negligence on that ground either. The next issue for decision is whether petitioners are liable for an addition to tax for substantial understatement of income tax under section 6661 for the taxable years 1982 and 1983. Since this addition to tax for the taxable year 1982 was raised in an amendment to respondent's answer, he bears the burden of proof for that year as it constitutes new matter. Rule 142(a). Petitioners still bear the burden of proof on this addition to tax for the taxable year 1983. Rule 142(a). This addition to tax is applicable if the amount required to be shown on the return exceeds the amount actually shown on the return by the greater of (i) 10-percent of the tax required to be shown on the return, or (ii) $ 5,000. Sec. 6661(b)(1)(A). However, the amount of the understatement *758 of tax is reduced *2119 by the portion of the understatement which is attributable to any item where there exists substantial authority for the treatment of the item or if the facts affecting the item are adequately disclosed in the return or in a statement attached to the turn. Sec. 6661(b)(2)(B). However, if the item is attributable to a tax shelter, adequate disclosure will not reduce the understatement and the substantial authority exception will only apply if the taxpayer reasonably believes that it is more likely than not the proper treatment. Sec. 6661(b)(2)(C). A tax shelter, for purposes of this section, is any plan or arrangement, the principal purpose of which is the avoidance or evasion of Federal income tax. Sec. 6661(b)(2)(C)(ii). As previously discussed, the Saxon Energy Brain leasing program was clearly a tax shelter. Therefore, the adequate disclosure exception does not apply. Also, there was no substantial authority for the treatment of the tax shelter items so that exception does not apply either. Accordingly, if as a result of the parties' Rule 155 computations, the understatement of tax is "substantial," the addition to tax will apply. The final *759 issue for decision is whether petitioners are liable for an increased rate of interest attributable to tax motivated transactions under section 6621(c). Section 6621(c)(3)(B) gives the Secretary the authority to designate certain tax motivated transactions that will be subject to 6621(c). Deductions disallowed for any period under section 183 relating to an activity not engaged in for profit are included in the transactions designated by the Secretary as tax motivated for purposes of section 6621(c). Sec. 301.6621-2T Q-4, Temporary Proced. & Admin. Regs. 49 Fed. Reg. 50392 (Dec. 28, 1984); Patin v. Commissioner, 88 T.C. 1086, 1127-1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion Patin v. Commissioner, 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). We have previously found that the deductions are not allowable because petitioner's leasing activity was not engaged in for *760 profit. Accordingly, the increased rate of interest applies for all taxable years in issue. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
*. Fifty percent of the interest due on the deficiency attributable to negligence.↩
2. In our calculation, we began with the $ 10,000 advanced lease payment in year one (it covered the next year's lease). In year two, we began with a fuel usage of $ 21,500. We then multiplied that by the fuel saved, 15-percent. We then multiplied that amount by 50-percent, the investor's share. We then multiplied the investor's share by 15-percent, the management company fee, and then subtracted it from the investor's share. That 85-percent residual amount is the investor's cut because there was no minimum lease payment due to Saxon in that year. Lastly, we discounted that amount back one year to the present value using a 20-percent discount factor. In the next year, and the years thereafter, we began with fuel usage of 111-percent of the previous year's fuel usage. We then went through the same calculations of energy saved, the investor's half of the energy saved, and the deduction for the management fee. In the early years, the amount remaining was less than the $ 2,500 minimum lease payment so Saxon was entitled to the entire amount, leaving the investor with nothing. Furthermore, the amount Saxon received was often less than the minimum payment of $ 2,500 so there was a deficit amount which would have to be made up in later years before the investor was entitled to anything. It was not until the last three years that the investor actually received any cash back, after having paid the year's current lease payment and the deficit minimum lease payments from prior years. In those years where the investor received cash, we discounted the amount back to year one, using a 20-percent discount rate. In the final analysis, we arrived at a negative discounted cash flow of $ 8,533 per unit.↩